UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
KIM PATRICK and AG, a minor, by and
through his Parent and Next Friend, Kim Patrick,


                                    Plaintiffs,

              -against-                                          **<u>MEMORANDUM & ORDER</u>**
                                                                  17–CV–6846 (PKC)(RLM)

SUCCESS ACADEMY CHARTER SCHOOLS,
INC.; SUCCESS ACADEMY PROSPECT
HEIGHTS; SYDNEY SOLOMON, in her
individual and official capacity as Principal of
Success Academy Prospect Heights; LAMAE
DE JONGH, in her individual and official
capacity as Managing Director of Schools,
Success Academy Charter Schools; SAMUEL
COLE, in his individual and official capacity as
Board Chairperson, Success Academy Charter
Schools–NYC Board of Trustees; and
CATHERINE SHAINKER, in her individual
and official capacity as Board Member,
Success Academy Charter Schools–NYC Board
of Trustees,

                                    Defendants.
------------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

         Plaintiffs Kim Patrick and her son, AG, bring this action against Defendants, pursuant to

42 U.S.C. § 1983 ("§ 1983" or "Section 1983"), the Individuals with Disabilities Education Act

("IDEA"), the Americans with Disabilities Act of 1990 ("ADA"), and Section 504 of the

Rehabilitation Act of 1973 ("Rehab Act" or "Rehabilitation Act"), in connection with Defendants

Success Academy Charter Schools, Inc.'s and Success Academy Prospect Heights's (collectively,

"Success Academy" or the "Success Academy Defendants") disciplinary procedures and use of

emergency medical services. For the reasons stated herein, Defendants' motion to dismiss is

granted in part and denied in part

# TABLE OF CONTENTS

BACKGROUND.................................................................................................1

    I.  RELEVANT FACTS...................................................................................1

        A.  2016–2017 SCHOOL YEAR.............................................................1

        B.  2017–2018 SCHOOL YEAR.............................................................9

    II.  PROCEDURAL HISTORY.........................................................................12

LEGAL STANDARD......................................................................................12

DISCUSSION.................................................................................................13

    I.  CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS..................................13

        A.  DEFENDANT DE JONGH.................................................................14

            1.  UPHOLDING AG'S SEPTEMBER 12, 2017 SUSPENSION...............14

            2.  CLAIMS REGARDING LACK OF TRANSCRIPT, UNSWORN WITNESSES, AND FAILURE TO CALL THE PARA-PROFESSIONAL AS A WITNESS.....................................16

        B.  DEFENDANTS COLE AND SHAINKER................................................17

        C.  DEFENDANT SOLOMON.................................................................18

    II.  CLAIMS BROUGHT BY PLAINTIFF PATRICK............................................22

    III.  AG'S PROCEDURAL DUE PROCESS CLAIM............................................23

        A.  ARTICLE 78 HEARING...................................................................24

        B.  LEGAL STANDARD........................................................................27

        C.  WAS AG DEPRIVED OF A PROPERTY INTEREST?.............................30

        D.  WHAT PROCESS WAS AG DUE?....................................................38

            1.  FEBRUARY 24, 2017 SUSPENSION........................................40

            2.  SEPTEMBER 12, 2017 SUSPENSION.......................................43

                 a.  HEARING TRANSCRIPT OR RECORDING.............................43

i

      **b. SWORN TESTIMONY**……………………………………………………...47

      **c. TESTIMONY BY THE PARA-PROFESSIONAL**…………………………48

**IV. ADA/REHABILITATION ACT**………………………………………………50

   **A. EXHAUSTION**……………………………………………………………51

   **B. MERITS**…………………………………………………………………55

**V. IDEA CLAIMS**………………………………………………………………56

   **A. EXHAUSTION**……………………………………………………………56

     **1. OVERVIEW OF THE IDEA'S EXHAUSTION REQUIREMENT**……………56

     **2. APPLICABLE IDEA EXHAUSTION STANDARD**………………………57

   **B. MISUSE OF THE "SERIOUS BODILY INJURY" EXCEPTION**…………………58

     **1. EXHAUSTION**……………………………………………………58

       **a. FEBRUARY 24, 2017 INCIDENT**………………………………......58

       **b. SEPTEMBER 12, 2017 INCIDENT**……………………………60

     **2. MERITS**………………………………………………………...61

   **C. PROVISION OF APPROPRIATE ALTERNATIVE INSTRUCTION**………………...65

     **1. EXHAUSTION**……………………………………………………65

       **a. FEBRUARY 24, 2017 INCIDENT**……………………………66

       **b. SEPTEMBER 12, 2017 INCIDENT**……………………………66

     **2. MERITS**………………………………………………………......67

   **D. FAILURE TO RETURN AG TO SCHOOL**……………………………………67

   **E. DEPRIVATION OF DUE PROCESS RIGHTS**…………………………………68

     **1. EXHAUSTION**…………………………………………………...69

     **2. MERITS**…………………………………………………………70

**CONCLUSION**……………………………………………………..............72

**APPENDIX A**……………………………………………………..............74

**APPENDIX B**……………………………………………..............81

**APPENDIX C**……………………………………………..............83

**APPENDIX D**……………………………………………..............86

# BACKGROUND

## I.     Relevant Facts

Plaintiff AG is an eight-year-old student at Defendant Success Academy Prospect Heights, a public charter school in Brooklyn, New York.   (Complaint ("Compl."), Dkt. 1, at ¶ 55; Defendants' Brief ("Defs.' Br."), Dkt. 41, at 3.)   In the two years since AG started at Success Academy, he has been "suspended and excluded from school" over 25 times, for at least 70 school days.   (Compl. at ¶ 134); *see also Patrick v. Success Acad. Charter Sch., Inc.*, No. 17–CV–6846 (PKC)(RLM), 2017 WL 6557478, at *1–3 & n.5 (E.D.N.Y. Dec. 22, 2017) (discussing AG's suspensions).   It appears that he is currently in first grade for the third time.   (Compl., at ¶ 55; Defs.' Br., at 3 (noting that AG is still in first grade as of August 2018).)

AG is disabled and "other health impaired" due to Beta-thalassemia, a rare blood disorder, which causes him to have "below average academic performance, . . . speech[,] and language skills," as well as disruptive and dangerous behavior.   (Compl. at ¶¶ 56–58.)   As a result, he has an Individualized Education Plan ("IEP"), which entitles him to special education services, including speech and language therapy, counseling, and an individual crisis management para-professional.   (*Id.* at ¶ 57.)

### A.   2016–2017 School Year

AG was six years old when he started at Success Academy in the 2016–2017 school year. (*Id.* at ¶ 55.)   At that time, AG was in first grade.   (*Id.*)   Between October 27 and December 20, 2016, AG was suspended from school "on multiple occasions."   (*Id.* at ¶¶ 60–61.)[1]   According to

---

[1]Although AG has been issued more than 23 short-term suspensions, they do not form the basis of Plaintiffs' claims in this lawsuit.   The Court uses the term "short-term suspension" to refer to suspensions "not exceeding 10 days."   *Goss v. Lopez*, 419 U.S. 565, 584 (1975).   Suspensions in excess of 10 school days will be referred to as "long-term suspensions."   *Id.*

Plaintiff Kim Patrick ("Patrick"), AG's mother, during this period she was told by Defendants[2] "nearly every day . . . to remain at school for several hours to assist her son . . . due to his behavioral deficits." (*Id.* at ¶ 62.) Patrick further alleges that she was told by Defendant–Principal Sydney Solomon that if Patrick "was not available and AG had a behavior issue, the school would call 911." (*Id.*) Patrick subsequently asked for a meeting with AG's IEP team, which was scheduled for December 20, 2016, to reevaluate AG's special education needs. (*Id.* at ¶ 63.) Under the IDEA, an IEP team "must include the parents of the child, the child's regular and special education teachers, and a knowledgeable representative of the District," *Doe ex rel. Doe v. Todd Cty. Sch. Dist.*, 625 F.3d 459, 461 (8th Cir. 2010) (citing 20 U.S.C. §§ 1414(d)(1)(B), (d)(3)&(4)), and its role, *inter alia*, is to determine the appropriate "educational or related services needs" of the disabled child, 20 U.S.C. § 1414(a)(2)(1).[3]

On December 19, 2016, the day before the IEP meeting, Principal Solomon contacted the New York City Fire Department's Bureau of Emergency Medical Services ("EMS") when "AG exhibited tantruming behavior but was not experiencing any medical emergency." (Compl., at ¶ 64.) According to Plaintiffs, Defendants "were familiar with these [tantrum] behaviors and knew that [AG] had never hurt himself in school before." (*Id.*) Upon learning that EMS had been called, Patrick "rushed" to Success Academy and spoke to EMS. (*Id.*) AG was ultimately released to Patrick and missed the remainder of the school day. (*Id.*) On December 20, 2016, Patrick attended the scheduled IEP meeting. (*Id.* at ¶ 65.) The IEP team agreed to an integrated co–teaching

---

[2] As discussed *infra*, Plaintiffs' complaint does not specify which Defendants were involved in each incident and instead uses the general term "Defendants."

[3] The relevant portions of the IDEA cited in this opinion are collectively listed, substantially in full, in Appendix A.

program[4] and added more speech, occupational therapy, and counseling services for AG.  (*Id.*)

Between December 20, 2016 and early February 2017, AG was issued suspensions, all for fewer than 10 school days, for additional behavioral incidents.  (*Id.* at ¶¶ 66–67.)  On February 14, 2017, a Success Academy staff member, "Torcivia,"[5] called Patrick "and threatened to call 911 if Ms. Patrick did not come to the school to take AG home as he was having a tantrum."  (*Id.* at ¶ 68.)  Patrick went to the school and took AG home.  (*Id.*)  On February 16, 2017, Plaintiffs' attorney met with the IEP team to conduct a Manifestation Determination Review ("MDR"), (*id.* at ¶ 69), to discuss whether, pursuant to the IDEA, the conduct leading to the January and February suspensions were "caused by, or had a direct and substantial relationship to, [AG's] disability," 20 U.S.C. § 1415(k)(1)(E).  The IEP team determined that AG's behaviors were a manifestation of his disability and, as a result, AG was not required to serve the suspensions.  (Compl., at ¶¶ 69–70.)  Under the IDEA, "[i]f the student's behavior is not a manifestation of his disability, then the relevant discipline may be administered in the same manner applicable to a non-disabled student. If the behavior is a manifestation of the disability, then the child's placement is not changed (absent parental consent) and the IEP team must prepare a functional behavior assessment and a behavior intervention plan."  *Molina v. Bd. of Educ.*, 157 F. Supp. 3d 1064, 1068 (D.N.M. 2015) (citations omitted); 20 U.S.C. §§ 1415(j),(k)(1)(E)&(F).  AG was suspended again on February 17, 2017, the day after the MDR, and twice more thereafter, on February 22 and 23, 2017; each of these suspensions was for fewer than 10 school days.  (Compl., at ¶ 70.)

---

[4] Integrated co–teaching services "means the provision of specially designed instruction and academic instruction provided to a group of students with disabilities and nondisabled students." *M.W. ex rel. S.W. v. N.Y. City Dep't of Educ.*, 725 F.3d 131, 144 (2d Cir. 2013) (quoting N.Y. Comp. Codes R. & Regs. tit. 8 § 200.6(g)).

[5] The complaint does not include Torcivia's full name or position.

On February 24, 2017, an unidentified Success Academy employee called EMS when AG exhibited "tantruming behavior." (*Id.* at ¶ 71.) According to Defendants, AG "caused serious bodily injury and extreme pain by, *inter alia*, dragging the Assistant Principal down the hall by the hair while using the other hand to hit her, yanking a lanyard around the Assistant Principal's neck, kicking Principal Solomon," and "inflict[ing] serious bodily injury and extreme physical pain upon [his] para[-professional]." (*Id.* at ¶ 79.) Defendants did not call Patrick until EMS and police officers from the New York City Police Department were at the school. Patrick, who was at work, asked a Success Academy staff member to let her speak to EMS, but the staff member did not allow Patrick to do so. (*Id.* at ¶ 72.) According to Plaintiffs, AG's allegedly injured para-professional then called Patrick and told her "that the school staff took [AG] and told the EMS workers to take him to the hospital" even though he had been "calmly sitting on the para[-professional]'s lap." (*Id.*) AG was ultimately taken to the emergency room over Patrick's objections and was released from the hospital later the same day "with no treatment or referral." (*Id.* at ¶¶ 72–74.) AG missed the rest of the school day and Patrick was charged $1,860 for the cost of EMS transport. (*Id.* at ¶¶ 75, 77.)

That evening, Defendants informed Patrick that AG was suspended for 45 school days for the incident and would be placed in an Interim Alternative Educational Setting ("IAES") for the duration. (*Id.* at ¶ 79.) Although AG was immediately suspended from attending class at Success Academy, his IAES did not begin until 5 days later. Plaintiffs dispute whether the alternative instruction AG was provided properly constituted an IAES, (Plaintiffs' Brief ("Pls.' Br."), Dkt. 40, at 6), because, under the IDEA, an IAES "shall be determined by the IEP Team," 20 U.S.C. § 1415(k)(2). The IDEA provides that a student with a disability generally remains in his educational placement after he is suspended until an MDR is conducted. 20 U.S.C. § 1415(j). However,

"school personnel may . . . order a change in placement for a child with a disability who violates a code of student conduct." *Id.* § 1415(k)(1)(A). If the suspension is for "not more than 10 school days," a school may suspend a disabled student from their current placement and remove the student "to an appropriate [IAES], another setting, or suspension[,] . . . []to the extent such alternatives are applied to children without disabilities[]." *Id.*; *see Farrin v. Me. Sch. Admin. Dist. No. 59*, 165 F. Supp. 2d 37, 41 (D. Me. 2001). But, "school officials [who] unilaterally (i.e., without the parent's consent) remove a disabled child for more than ten days" must provide the child with an IAES "so as to enable the child to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP." *Todd Cty. Sch. Dist.*, 625 F.3d at 463 (quoting 20 U.S.C. § 1415(k)(1)(D)(i)); *Farrin*, 165 F. Supp. 2d at 41–43 ("[A]s of the eleventh day of suspension (i.e. the change of placement), the school must provide the child with an alternative educational setting."). According to Plaintiffs, AG's supposed IAES began on March 2, 2017 (Pls.' Br., at 6 n.3)—four school days after the February 24 incident—and consisted of only two hours per day of general education in a public library with an unlicensed teacher and no special education services (Compl., at ¶ 88).

Additionally, under the IDEA, "[w]ithin ten school days of a decision changing the child's placement[6] because of misconduct," the IEP team must conduct an MDR. *Todd Cty. Sch. Dist.*, 625 F.3d at 461 (citing 20 U.S.C. § 1415(k)(1)(E)). If, as in this case, the change in placement to an IAES (1) "exceed[s] 10 school days" and (2) "the behavior that gave rise to the violation of the school code is determined not to be a manifestation of the child's disability[,] . . . the relevant disciplinary procedures applicable to children without disabilities may be applied to the child in

---

[6] A suspension for more than 10 days constitutes a change of placement. *Honig v. Doe*, 484 U.S. 305, 325 n.8 (1988).

the same manner and for the same duration in which the procedures would be applied to children without disabilities." 20 U.S.C. § 1415(k)(1)(C). An MDR was held with respect to the February 24, 2017 incident on March 10, 2017—10 school days after AG's suspension began—which determined that AG's behavior was not a manifestation of his disability. As a result, AG continued to serve his 45-day suspension and received a purported IAES for the duration of the suspension. (Dkt. 7-4, at ECF[7] 37[8]; Compl., at ¶ 88.)

Plaintiffs allege that they were provided with "no notice or opportunity for a hearing to contest the charge, or any information about their due process rights" before AG was suspended for 45 school days for the February 24, 2017 incident. (Compl., at ¶ 80.) Plaintiffs therefore requested, pursuant to the IDEA, an expedited impartial due process hearing "challenging

---

[7] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[8] At the motion to dismiss stage, a court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). "To be incorporated by reference, the Complaint must make a clear, definite and substantial reference to the documents." *Thomas v. Westchester Cty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002). The Court finds that Plaintiffs have incorporated the two IDEA decisions by the Impartial Hearing Officer and accompanying hearing requests by reference.

Alternatively, "even if not attached or incorporated by reference, a document 'upon which [the complaint] solely relies and which is integral to the complaint' may be considered by the court in ruling on such a motion." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)) (emphasis omitted). The Court finds that the two IDEA decisions by the Impartial Hearing Officer "are integral to [Plaintiffs'] Complaint, even if they are not attached as an exhibit. Because these documents are integral, because [Plaintiffs'] knew of and possessed them, and because there is no dispute as to their authenticity, the Court may consider them without converting the Defendants' motion to dismiss into a motion for summary judgment." *Thomas*, 232 F. Supp. 2d at 276.

Finally, courts "may take judicial notice of the records of state administrative procedures, as these are public records, without converting a motion to dismiss to one for summary judgment." *Evans v. N.Y. Botanical Garden*, No. 02–CV–3591 (RWS), 2002 WL 31002814, at *4 (S.D.N.Y. Sept. 4, 2002).

Defendants' actions as illegal, and asserting [that] the allegations against AG were false and exaggerated." (*Id.* at ¶ 81.) Under the IDEA, "[t]he parent of a child with a disability who disagrees with any decision regarding placement, or the manifestation determination . . . may request a hearing" overseen by an Impartial Hearing Officer ("IHO"). 20 U.S.C. § 1415(k)(3)(A). After the hearing, an IHO may either "(I) return a child with a disability to the placement from which the child was removed" or "(II) order a change in placement to an appropriate [IAES] for not more than 45 school days if the hearing officer determines that maintaining the current placement of [the] child is substantially likely to result in injury to the child or to others." 20 U.S.C. § 1415(k)(3)(B)(ii). "That decision can then be appealed to a state review officer [("SRO")] of the New York Education Department." *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 (2d Cir. 2008) ("New York has opted for a two-tier administrative system for review of IEPs. First, an impartial hearing officer is selected . . . to conduct the initial hearing and issue a written decision. That decision can then be appealed to a[n] [SRO] of the New York Education Department."). "[T]he child shall remain in the interim alternative educational setting pending the decision of the hearing officer." 20 U.S.C. § 1415(k)(4)(A).

According to Plaintiffs, on March 29, 2017, the IHO issued a written decision, finding that: (1) Defendants had failed to provide Patrick with notice and an opportunity for a suspension hearing in "plain violation of due process," but the IHO "did not have jurisdiction to order a suspension hearing in the matter;" (2) the allegations made by Defendants "did not rise to the level of serious bodily injury" as defined by the IDEA[9]; (3) AG should be immediately reinstated to

---

[9] Under the IDEA, the school may remove a student to an IAES for up to 45 school days "without regard to whether the [child's] behavior is determined to be a manifestation of the child's disability" in cases where the child has "inflicted serious bodily injury upon another person while at the school, on school premises, or at a school function." 20 U.S.C. § 1415(k)(1)(G). "Serious

Success Academy; and (4) the DOE[10] must provide "compensatory education" and related services for the days AG was out of school. (Compl., at ¶¶ 82–84.) AG returned to Success Academy after having missed approximately 24 days of school (out of the original 45–day suspension), during which he did not receive any of his special education support services. (*Id.* at ¶¶ 87–89.)

AG was subsequently suspended four times, each time for fewer than 10 school days, in April 2017 for "tantruming behaviors." (*Id.* at ¶ 90.) On April 25, 2017, while Patrick was attending an MDR meeting regarding the April suspensions, Torcivia again contacted Patrick to tell her that Defendants had called EMS due to AG's behavior. (*Id.* at ¶ 91.) Patrick "ran out" of the meeting and went to Success Academy to prevent AG from being taken to the hospital. (*Id.* at ¶¶ 92–93.) Patrick spoke with an EMS worker on the phone who "said he would not take [AG] to the hospital and [that] he did not believe there was any legitimate reason to do so." (*Id.* at ¶ 94.) Patrick took AG home and he was suspended for three school days. (*Id.* at ¶¶ 95–97.) Plaintiffs allege that "Defendants called EMS to harass, scare, intimidate, and retaliate against [Patrick] for

---

bodily injury" under the IDEA is defined by its meaning in 18 U.S.C. § 1635(h)(3). *Id.* Under Section 1635(h)(3), the term "serious bodily injury" means bodily injury which involves—
    (A) a substantial risk of death;
    (B) extreme physical pain;
    (C) protracted and obvious disfigurement; or
    (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

[10] Success Academy is allegedly not a party to the IDEA administrative impartial hearing process. (Compl., at ¶¶ 85, 137.) At the April 24, 2018 pre-motion conference, Defendants stated that they were "bound by determinations made by the State Education Department [("SED")]," but not the IHO. (Pre-motion Conference Transcript ("PMC Tr."), Dkt. 45, at 24:14–20.) However, Plaintiffs allege that the SED and the SRO are two different entities, such that Success Academy is not bound by any part of the IDEA process. (Pls.' Br., at 10 & n.10.) "When deciding a motion to dismiss for failure to state a claim, a district court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the non-moving party." *Salazar v. Chertoff*, No. 05–CV–2876 (BSJ), 2007 WL 2172821, at *1 (S.D.N.Y. Apr. 13, 2007). Thus, for purposes of the motion to dismiss, the Court assumes that Success Academy is not bound by the IDEA process, including the impartial hearing review procedure.

enforcing her rights at the MDR meeting, and to force AG out of the school due to his disability."
(*Id.* at ¶ 93.)  AG was suspended three more times, each for fewer than 10 days, between April 25,
2017 and June 6, 2017.  (*Id.* at ¶ 98.)

**B.  2017–2018 School Year**

On August 16, 2017, AG returned to Success Academy for the 2017–2018 school year.
(*Id.* at ¶ 99.)  The suspensions for the 2016–2017 school year resulted in AG missing enough class
time—"over half of th[e] academic school year"—at Success Academy that he had to repeat the
first grade.  (*Id.* at ¶ 134.)

Over the first two weeks of school, AG was suspended three times for a total of seven
school days.  (*Id.* at ¶¶ 100–01.)  On September 12, 2017, someone at Success Academy called
AG's parents to inform them that EMS had been called but did not take AG to the hospital.  (*Id.* at
¶ 102.)  Additionally, AG's father, Gavin,[11] was told that AG "had engaged in dangerous behavior
and that he had hit his para[-professional] and stabbed her in the eye with a pencil, and that the
para[-professional] immediately left the school via EMS."  (*Id.* at ¶ 103.)  However, after Gavin
arrived at Success Academy, he allegedly "[saw] the para[-professional] in the hall" and she "did
not appear to be in distress or in pain."  (*Id.*)  He told Success Academy staff, including Principal
Solomon, what he had observed.  (*Id.*)  The following day, Patrick received a letter stating that AG
could not attend school, was suspended for the prior day's behavior, would be removed to an IAES
for 20 school days, and would receive a suspension hearing.  (*Id.* at ¶¶ 104–105.)  According to
Plaintiffs, this was the first time that Patrick and Gavin had been offered a hearing to determine
whether one of AG's suspensions was appropriate.  (*Id.* at ¶ 106.)

On September 18, 2017, an "informal" hearing was held at Success Academy before

---

[11] The complaint does not state Gavin's surname.

Defendant LaMae de Jongh, the Managing Director of Success Academy Charter Schools, to assess whether the 20–day IAES placement was appropriate. (*Id.* at ¶¶ 107–08.) Defendant Solomon, AG's teacher, and AG's father all testified at the hearing; none were put under oath and no verbatim record or recording of the hearing was maintained. (*Id.* at ¶¶ 109, 111–12, 115–16, 118.) The school also introduced as evidence an index card from the allegedly injured para-professional that contained her recitation of the events, but she did testify and no evidence regarding medical treatment for her alleged injuries was introduced. (*Id.* at ¶¶ 113–14.) On September 20, 2017, Managing Director de Jongh found that "the IAES was appropriate" because AG had "[i]nflicted serious bodily injury upon another person." (*Id.* at ¶¶ 117–18.) The following day, Plaintiffs filed an expedited hearing request under the IDEA seeking AG's immediate reinstatement. (*Id.* at ¶ 119.) However, the hearing date was set for October 17, 2017, at which point AG would have already served the full suspension, and the request was subsequently withdrawn without prejudice. (*Id.*); 20 U.S.C. § 1415(k)(4)(B) ("[T]he State or local educational agency shall arrange for an expedited hearing, which shall occur within 20 school days of the date the hearing is requested and shall result in a determination within ten school days after the hearing.").

On September 26, 2017—10 school days after AG's suspension began—an MDR was conducted regarding the September 12, 2017 incident. (Compl., at ¶¶ 120–23.) AG's behavior was determined to be a manifestation of his disability and the MDR team "directed that AG be returned to school immediately." (*Id.* at ¶ 123.) The next day, however, when Patrick attempted to take AG to school, Success Academy staff "informed her that [AG] was not allowed to attend school and was required to serve his suspension[,] as he had inflicted serious bodily injury and/or serious bodily harm on the para[-professional], regardless of the MDR finding." (*Id.* at ¶ 124.) As

discussed *supra* (*see* note 9), under the IDEA, school personnel may "remove a student to an [IAES] for not more than 45 school days *without regard* to whether the behavior [at issue] is determined to be a manifestation of the child's disability," *inter alia*, "where a child has inflicted serious bodily injury upon another person while at school." 20 U.S.C. § 1415(k)(1)(G) (emphasis added).

On September 29, 2017, Plaintiffs filed an internal appeal of Managing Director de Jongh's findings to Defendant Samuel Cole, the Success Academy Board Chairperson. The suspension was upheld on October 17, 2018 by Defendant Catherine Shainker, a Success Academy board member. (Compl., at ¶¶ 16, 125–26.) In response to this determination, Plaintiffs re-filed their IDEA Impartial Hearing Request, and a hearing was held on November 6, 2017. (*Id.* at ¶¶ 127–28.) On November 14, 2017—by which point, AG had already served the entirety of his suspension and was back at Success Academy—the IHO "found the appropriateness of both the suspension hearing held by Defendants and the suspension to an IAES to be outside his jurisdiction, . . . [but also] found that based on the record, it was highly unlikely that the standard of serious bodily injury was met." (*Id.* at ¶¶ 125, 128.) Additionally, the IHO awarded Plaintiffs compensatory special education services for each day of school that AG was in an IAES placement. (Dkt. 7-4, at ECF 59–60.)

An IEP meeting was held on November 17, 2017, during which Success Academy's employees opposed AG continuing in an integrated co-teaching placement, and asked the Committee on Special Education ("CSE")—a New York City DOE committee that handles the special education process for students enrolled in non-DOE charter schools, N.Y. Educ. Law § 3214—to change AG to a classroom with fewer students, which is not offered at Success Academy. According to Plaintiffs, Success Academy employees "expressly stated that they did not want AG

to remain at the school." (Compl., at ¶¶ 130–31.)  That same day, when Gavin went to pick up AG from school, Success Academy employees "told [Gavin] that AG would not be allowed back to school" because they "had found a bedbug on AG's clothing and he would be barred from attending school until AG's parents had their home inspected and, if necessary[,] treated, by an exterminator at their own expense and provided proof of such." (*Id.* at ¶ 132.)  A professional inspection of Plaintiffs' home "showed no sign" of bedbugs. (*Id.* at ¶ 133.)  Five days later, Plaintiffs filed the instant action.

## II.    Procedural History

On November 22, 2017, Plaintiffs filed their complaint and motion for preliminary injunction in this action. (Dkts. 1, 7.)  The motion for preliminary injunction was denied on December 22, 2017 and the Court declined to exercise supplemental jurisdiction over the novel state law issue of whether New York Education Law § 3214—which, *inter alia*, establishes the disciplinary procedures for publicly educated students in the state—applies to charter schools like Success Academy. *Patrick*, 2017 WL 6557478, at *1–6 & n.7.  Following a pre-motion conference on April 24, 2018, Plaintiffs withdrew their remaining state law claims. (Dkt. 33.)  Defendants' motion to dismiss as to the remaining claims was fully briefed on August 13, 2018. (Dkt. 41.)

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556).  The "plausibility standard

is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). "In addressing the sufficiency of a complaint, [the Court] accept[s] as true all factual allegations and draw[s] from them all reasonable inferences; but [the Court is] not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).

## DISCUSSION

Defendants move to dismiss Plaintiffs' complaint in its entirety. Regrettably, Plaintiffs' complaint and opposition brief are woefully unclear as to (1) the contours of Plaintiffs' claims, (2) which claims are being brought against which Defendants, and (3) which claims are being brought by which Plaintiff. The Court, however, has attempted to construe Plaintiffs' claims liberally, given the significant constitutional questions implicated by these claims, *Patrick*, 2017 WL 6557478, at *3, and the current stage of this action. Moreover, both parties have given short shrift to the novel and complex constitutional and statutory claims at issue here, which has necessitated the Court's independent identification and review of a multitude of school disciplinary due process cases.[12] The Court addresses each claim in turn.

## I.     Claims Against the Individual Defendants

For the reasons stated herein, the Court dismisses Plaintiffs' claims against the four

---

[12] Indeed, the Court's review has included over 1,000 such cases.

individual Defendants.[13]

**A. Defendant de Jongh**

The Court construes Plaintiffs' complaint as alleging that Defendant de Jongh violated AG's Fourteenth Amendment due process rights[14] by: (1) upholding AG's suspension; (2) not providing Plaintiffs with a transcript or recording of the September 12, 2017 suspension hearing; (3) not putting the witnesses under oath at the hearing; and (4) failing to have the allegedly injured para-professional testify at the hearing. Defendants' motion to dismiss is granted as to these claims against de Jongh in their entirety.

**1. Upholding AG's September 12, 2017 Suspension**

To the extent that Plaintiffs argue that de Jongh's decision was incorrect, that is not a cognizable basis for a procedural due process claim. While Plaintiffs may "express[] their dissatisfaction with the outcome of their interactions with Defendants, . . . procedural due process guarantees only a process, not a specific outcome." *S.C. v. Monroe Woodbury Cent. Sch. Dist.*, No. 11–CV–1672 (CS), 2012 WL 2940020, at *9 (S.D.N.Y. July 18, 2012) (collecting cases); *see also Wilk v. St. Vrain Valley Sch. Dist.*, No. 15–CV–1925 (RPM), 2017 WL 3190443, at *8 (D. Colo. July 27, 2017); *Schomburg v. Johnson*, No. 08–CV–11361 (GAO), 2009 WL 799466, at *3 (D. Mass. Mar. 25, 2009) ("[P]rocedural due process does not guarantee satisfactory, or even

_____

[13] In light of the dismissal of the individual Defendants, any claims Plaintiffs are making for punitive damages are dismissed. *Barnes v. Gorman*, 536 U.S. 181, 189 (2002) ("[P]unitive damages may not be awarded in private suits . . . brought under § 202 of the ADA and § 504 of the Rehabilitation Act."); *Brown v. Baldwin Union Free Sch. Dist.*, 603 F. Supp. 2d 509, 518–19 (E.D.N.Y. 2009) ("Although neither the Supreme Court nor the Second Circuit has answered [the] question directly, this Court concurs with the many district courts that have all reached a single conclusion on the question—school districts and boards of education are municipal entities immune from punitive damages under . . . § 1983.") (collecting cases).

[14] The Court construes Plaintiffs' Fourteenth and Fourth Amendment claims as being brought pursuant to Section 1983.

correct, outcomes.  It only requires that [plaintiff] have been given notice of the proposed discipline and an opportunity to speak [his or her] piece to the decision-maker prior to the imposition of the punishment.") (citing *Donovan v. Ritchie,* 68 F.3d 14, 18 (1st Cir. 1995)).

To the extent that Plaintiffs may also be arguing that Defendant de Jongh was biased against them, this claim fails as well.  (*See* Pls.' Br., at 19–20); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) ("[A] biased decisionmaker [is] constitutionally unacceptable [and] 'our system of law has always endeavored to prevent even the probability of unfairness.'") (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).  There is a presumption "that administrators are honest and impartial, and therefore capable of judging a particular controversy fairly on the basis of its own circumstances.  The presumption is a rebuttable one, but the burden of rebuttal is heavy indeed: To carry that burden, the party claiming bias must lay a specific foundation of prejudice or prejudgment, such that the probability of actual bias is too high to be constitutionally tolerable." *Hess v. Bd. of Trs.*, 839 F.3d 668, 675 (7th Cir. 2016) (citations and internal quotation marks omitted); *see also Doe v. Cummins*, 662 F. App'x 437, 449–50 (6th Cir. 2016) (collecting cases). "Actual bias could be 'personal animosity, illegal prejudice, or a personal or financial stake in the outcome.'  To survive a motion to dismiss, [a plaintiff] needs to allege specific, non-conclusory facts that if taken as true show actual bias." *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 656 (S.D. Ohio 2016) (quoting *Ikpeazu v. Univ. of Neb.*, 775 F.2d 250, 254 (8th Cir. 1985)); *Duke v. N. Tex. State Univ.*, 469 F.2d 829, 834 (5th Cir. 1972) ("Alleged prejudice of [school] hearing bodies must be based on more than mere speculation and tenuous inferences.").  Plaintiffs have made no such allegations here.  *See DeFabio v. E. Hampton Union Free Sch. Dist.*, 658 F. Supp. 2d 461, 492 (E.D.N.Y. 2009) (concluding that, where plaintiffs provided "no evidence to support [their] conclusory assertion of bias[,] . . . .[their] subjective belief that the decision-makers were

not sufficiently open-minded about their position [was] insufficient to create an issue of fact on a procedural due process claim"), *aff'd*, 623 F.3d 71 (2d Cir. 2010).  Additionally, even if de Jongh had displayed bias, Plaintiffs "[were] able to (and did) appeal that administrator's decision [suspending AG] to another adjudicative body[, as alleged in Plaintiffs' complaint,] . . . and there is no contention that any of the latter individuals was biased against [AG]." *Hess*, 839 F.3d at 677 (rejecting procedural due process claim where, *inter alia*, the allegedly biased decision was affirmed on appeal and there was no allegation of bias against the appellate authority).[15]

### 2. Claims Regarding Lack of Transcript, Unsworn Witnesses, and Failure to Call the Para-Professional as a Witness

Although the Court finds that AG has stated a due process claim with respect to whether the burden of proof was met for a suspension (*see infra* Section III(D)(2)(c)), Defendant de Jongh is entitled to qualified immunity as to Plaintiffs' claims that they were not provided a transcript of the September 12, 2017 suspension hearing, that witnesses were not placed under oath at the hearing, and that the para-professional who allegedly was injured by AG was not called as a witness at the hearing.[16]

"[T]he doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

---

[15] It is unclear if Plaintiffs are also implying that de Jongh had predetermined the outcome before the suspension hearing.  (*See* Compl., at ¶ 108 ("Defendant de Jongh announced that the hearing was going to be 'informal' and was only to assess if the twenty (20) day placement to the IAES was appropriate.").)  If there is "evidence suggesting policymakers have predetermined the result of [the due process] procedures, schools and their policymakers may run afoul of the Constitution when they issue an out-of-school suspension, regardless of how they characterize it." *Wooleyhan v. Cape Henlopen Sch. Dist.*, No. 10–CV–153(A) (MMB), 2011 WL 4048976, at *7 (D. Del. Sept. 12, 2011).  However, because Plaintiffs have failed to brief this issue, the Court declines to address it.

[16] As discussed *infra* Section III(D)(2)(a)&(b), Plaintiffs are not entitled to a transcript or sworn testimony.

rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and internal quotation marks omitted). In this circuit, "a right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) (quoting *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003)); *see also White v. Pauly*, 137 S. Ct. 548, 552 (2017) ("[I]t is . . . necessary to reiterate the longstanding principle that clearly established law should not be defined at a high level of generality. As this Court explained decades ago, the clearly established law must be particularized to the facts of the case.") (per curiam) (citations and internal quotation marks omitted). The parties have not put forth, and the Court has not identified, any Supreme Court or Second Circuit case law recognizing a procedural due process right to a transcript or sworn testimony in connection with a school suspension hearing, or establishing the burden of proof in such a hearing. *See Rubino v. Saddlemire*, No. 3:05–CV–1955 (PCD), 2007 WL 685183, at *8 (D. Conn. Mar. 1, 2007) (noting that "the Second Circuit has not specifically addressed the issue of the sufficiency of the evidence in school disciplinary proceedings").

Accordingly, all claims against Defendant de Jongh are dismissed.

**B. Defendants Cole and Shainker**

The Court construes Plaintiffs' complaint as alleging that Defendants Cole and Shainker, Success Academy Board Chair and member, respectively, violated AG's Fourteenth Amendment due process rights by affirming Managing Director de Jongh's suspension decision. The Court finds that this claim fails for two reasons. First, Plaintiffs' claim "runs counter to precedent holding that those subject to school discipline do not enjoy a due process right to *any* appellate review." *Oladokun v. Ryan*, No. 06–CV–2330 (KMW), 2010 WL 3910578, at *12 (S.D.N.Y. Sept. 30,

2010) (emphasis in original) (collecting cases); *see also Heyne v. Metropolitan Nashville Public Schools*, 655 F.3d 556, 569–70 (6th Cir. 2011) ("Any greater process provided by a state, such as review by a school board, is completely gratuitous. Any such additional procedural protections are not required by due process nor do they give rise to any due process rights.") (citations and internal quotation marks omitted) (collecting cases); *Brewer ex rel. Dreyfus v. Austin Indep. Sch. Dist.*, 779 F.2d 260, 263 (5th Cir. 1985) ("Although schools may wish to provide appellate mechanisms to cure procedural errors that can creep into initial suspension proceedings, they are not required to do so by the Constitution. Due process need only be provided once."). Plaintiffs have cited no cases to the contrary.[17]

Second, even assuming AG did have a right to appeal, Plaintiffs do not allege how, or in what way, Defendants Cole and Shainker violated AG's appellate due process rights. Therefore, Defendants' motion to dismiss is granted as to Defendants Cole and Shainker.

## C. Defendant Solomon

Plaintiffs allege that the Success Academy Defendants and Defendant Solomon violated AG's Fourth Amendment rights relating to seizure by "physically removing AG from his school to a hospital emergency room when there was no medical necessity to take such action."[18]

---

[17] However, some courts have found that an appeal is not required based on the fact that the underlying hearing satisfied due process, suggesting that there is otherwise a right to appeal the outcome of a school disciplinary hearing. *See, e.g., C.Y. ex rel. Antone v. Lakeview Pub. Sch.*, 557 F. App'x 426, 434 (6th Cir. 2014) ("Courts have consistently held that there is no right to an appeal from an academic disciplinary hearing that satisfies due process.") (citation omitted); *Winnick v. Manning*, 460 F.2d 545, 549 n.5 (2d Cir. 1972) (finding, pre–*Goss*, "[plaintiff] had no constitutional right to review or appeal after the disciplinary hearing which satisfied the essential requirements of due process").

[18] To the extent that Plaintiffs allege that Defendant Solomon is also liable under the IDEA, ADA, or Rehab Act in her personal capacity for calling EMS, there is "no individual liability." *Dorsey v. Sullivan*, No. 10–CV–744(F) (LGF), 2013 WL 4776344, at *6 (W.D.N.Y. Sept. 3, 2013)

(Compl., at ¶ 174.) "To state a claim under § 1983, a plaintiff must allege that defendants violated plaintiff's federal rights while acting under color of state law." *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014). In this case, "the relevant Fourth Amendment inquiry is whether there was a seizure and, if so, whether that seizure was reasonable. In the schoolhouse, a seizure is reasonable if it was (1) 'justified at its inception' and (2) 'reasonably related in scope to the circumstances which justified' the seizure in the first place." *Schafer v. Hicksville Union Free Sch. Dist.*, No. 06–CV–2531 (JS)(ARL), 2011 WL 1322903, at *8 (E.D.N.Y. Mar. 31, 2011) (quoting *Bisignano v. Harrison Cent. Sch. Dist.*, 113 F. Supp. 2d 591, 597 (S.D.N.Y. 2000)); *Camac v. Long Beach City Sch. Dist.*, No. 09–CV–5309 (DRH)(ARL), 2011 WL 3030345, at *8 (E.D.N.Y. July 22, 2011). At the same time, the Supreme Court "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969). "In evaluating a challenged seizure, the Court reviews the totality of the circumstances." *Schafer*, 2011 WL 1322903, at *8.

Plaintiff's Fourth Amendment claim against Defendant Solomon fails for two reasons. First, although Plaintiffs allege that Solomon called EMS on December 19, 2016, they do not

---

(ADA and Rehabilitation Act) (citing *Garcia v. State Univ. of N.Y. Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001)); *S.W. ex rel. J.W. v. Warren*, 528 F. Supp. 2d 282, 298 (S.D.N.Y. 2007) (IDEA). And, to the extent official capacity claims can be alleged under these statutes, the Court also dismisses these claims against Defendant Solomon in her official capacity because they are "wholly redundant" to Plaintiffs' claims against Success Academy itself. *Emmons v. City Univ. of N.Y.*, 715 F. Supp. 2d 394, 408 (E.D.N.Y. 2010), *modified* (July 2, 2010) (collecting cases); *see also B.D.S. v. Southold Union Free Sch. Dist.*, No. 08–CV–1319 (SJF)(WDW), 2009 WL 1875942, at *21 (E.D.N.Y. June 24, 2009) (dismissing "official capacity" ADA and Rehab Act claims *sua sponte* because the school district and/or state educational agency were "the real parties in interest with respect to plaintiff's official capacity claims under the ADA, Rehabilitation Act[,] and IDEA").

allege that AG was actually "seized," i.e., removed from school, by EMS on that occasion. (*See* Compl., at ¶ 64.) Second, and more generally, although Fourth Amendment claims for unlawful seizure may be brought against a third-party defendant who is not the seizing government actor, but who affirmatively "request[s]" or "compels" the unlawful seizure, *McGugan*, 752 F.3d at 230, "liability will not attach to a defendant who merely seeks police [or medical] assistance or furnishes information to law enforcement [or medical] authorities who are then free to exercise their own judgment as to whether [a seizure] should be made," *Camac*, 2011 WL 3030345, at *8 (citation and internal quotation marks omitted); *see also Defalco v. MTA Bus Co.*, 333 F. Supp. 3d 191 (E.D.N.Y. 2018) (collecting cases).

Plaintiffs cite to two cases, both distinguishable from the facts of this case, in support of their allegation that calling EMS on AG constituted instigating or procuring an unlawful seizure. (Pls.' Br., at 22–23.) In *Camac*, the Honorable Denis R. Hurley allowed such a claim to survive a motion to dismiss. 2011 WL 3030345, at *8. However, in that case, the plaintiff alleged that the defendant-school administrators had "intentionally contacted the police and provided false information that would cause the police to confine [the student]." *Id.* Judge Hurley determined that a question of fact existed as to whether knowingly providing false information to the police rose to the level of instigating or procuring an arrest. *Id.* Here, Plaintiffs do not allege that Defendant Solomon, or any of the other Success Academy staff members, provided false information to EMS. In fact, Plaintiffs do not dispute that AG engaged in the "tantruming behavior" for which Success Academy staff members called EMS; instead, in conclusory fashion, they merely state that the behavior was not a medical emergency. (*See* Compl., at ¶¶ 64, 68, 71, 91, 93, 102.)

Second, Plaintiffs cite to *Eze v. Scott*, in which a city college's coordinator and psychologist

called EMS to take a student to a hospital for psychiatric evaluation. 11 F. Supp. 3d 376, 379 (E.D.N.Y. 2014). Although the Honorable Margo K. Brodie allowed an unreasonable seizure claim against the non–EMS defendants to proceed, the defendants in that case physically prevented the plaintiff from leaving the room once they had called EMS by blocking the exit and refusing the plaintiff's requests to leave the psychologist's office. *Id.* Here, there is no indication that AG was physically restrained, or that Plaintiff Patrick, once she arrived at Success Academy, was prevented from taking custody of her child. (*See* Compl., at ¶¶ 64, 68, 94, 102.)

Aside from the complaint not alleging that Defendant Solomon or any other Success Academy staff member knowingly gave false information to EMS or restrained AG so that he could be seized by EMS, the complaint indicates that EMS had an independent opportunity to observe AG each time they were called to Success Academy, as evidenced by the fact that EMS did not take AG to the hospital three of the four times they were called. (*Id.* at ¶¶ 64, 68, 72, 93–94).[19] Because "liability will not attach to a defendant who furnishes information to law enforcement authorities who are then free to exercise their own judgment as to whether [a seizure] should be made," Plaintiffs have failed to state a valid claim under the Fourth Amendment. *Camac*, 2011 WL 3030345, at *8 (citation and internal quotation marks omitted); *see also Lozada v. Weilminster*, 92 F. Supp. 3d 76, 91 (E.D.N.Y. 2015) (finding no liability where a police officer "had the opportunity to observe Plaintiff and make his own determination as to whether her behavior warranted arrest"); *Olowosoyo v. City of Rochester*, No. 08–CV–6007 (MAT), 2009 WL

---

[19] Even to the extent Plaintiffs allege that, in connection with the February 24, 2017 incident, a Success Academy staff member "took [AG] and told the EMS workers to take him to the hospital," (Compl., at ¶ 72), Plaintiffs do not allege that EMS failed to exercise independent judgment in taking AG to the hospital.

## II. Claims Brought by Plaintiff Patrick

To the extent Plaintiff Patrick seeks to bring her own due process claims (as opposed to ones brought on behalf of her child, AG), the Court finds that Patrick's individual procedural due process claims must be dismissed because she lacks standing. *See Irwin v. W. Irondequoit Cent. Sch. Dist.*, No. 6:16–CV–6028 (EAW), 2017 WL 881850, at *3 (W.D.N.Y. Mar. 2, 2017) (finding that the parent-plaintiff "lack[ed] standing to bring the asserted § 1983 claims based solely on the deprivation of the constitutional rights of [her] son") (collecting cases); *see also Jarmon v. Batory*, No. 94–CV–0284 (HJH), 1994 WL 313063, at *5 (E.D. Pa. June 29, 1994) (finding that the parents of expelled student lacked standing to bring their own due process claim where they failed to allege that "any right personal to them was violated by the defendants . . . [and] their claims [were] wholly derivative of [the child's] claims based on her suspension and subsequent expulsion"); *Boster v. Philpot*, 645 F.Supp. 798, 807 (D. Kan. 1986) ("[W]hen a student is suspended, it is the *student* who is entitled to due process because it is the student—not [his] parents—who has a right to a free public education.") (emphasis in original). However, Patrick may bring due process claims

---

[20] In light of this holding, Plaintiffs' Fourth Amendment claim against the Success Academy Defendants is also dismissed. Under Second Circuit case law, "a prerequisite to municipal liability under *Monell* is an underlying constitutional violation by a state actor. '*Monell* . . . *extends* liability to a municipal organization where that organization's . . . policies or customs that it has sanctioned[] led to an independent constitutional violation.'" *Henry-Lee v. City of N.Y.*, 746 F. Supp. 2d 546, 567 (S.D.N.Y. 2010) (quoting *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006)) (emphasis in original). Once a "district court properly [finds] no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* [is] entirely correct." *Segal*, 459 F.3d at 219; *see also Lener v. Hempstead Pub. Sch.*, 55 F. Supp. 3d 267, 283 n.14 (E.D.N.Y. 2014) ("[W]hen a plaintiff lacks any underlying claim of a deprivation of a constitutional right, the claim of municipal liability on the part of the municipal defendant must be dismissed as well."). In light of the Court's decision dismissing Plaintiffs' underlying Fourth Amendment claim, Plaintiffs' Fourth Amendment *Monell* claim is also dismissed.

on behalf of her minor son. *Marino v. Chester Union Free Sch. Dist.*, 859 F. Supp. 2d 566, 568 (S.D.N.Y. 2012) ("[W]here minor children are the real parties in interest, parents appropriately bring litigation on their children's behalf.") (collecting cases). Additionally, Patrick has standing to bring claims in her individual capacity under the IDEA, *see generally Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516 (2007),[21] as well as under the ADA and Rehab Act, *B.C. v. Mount Vernon Sch. Dist.*, 660 F. App'x 93, 95–97 (2d Cir. 2016).[22]

## III. AG's Procedural Due Process Claim

AG[23] asserts a Section 1983 claim against the Success Academy Defendants,[24] alleging

---

[21] Patrick's individual IDEA claims include, as discussed *infra*, her IDEA claims brought under Section 1983. *Winkelman*, 550 U.S. at 531 ("The status of parents as parties is not limited to matters that relate to procedure and cost recovery. To find otherwise would be inconsistent with the collaborative framework and expansive system of review established by the [IDEA].").

[22] Given the absence of any relevant argument in her opposition brief, it appears that Patrick has withdrawn her Fourteenth Amendment claim alleging that by calling EMS and "forcibly removing AG from the school to the emergency room against or without parental consent where there was no urgent medical necessity, Defendants violated Plaintiffs' liberty interest to association and family integrity." (Compl., at ¶ 149); *Romeo & Juliette Laser Hair Removal, Inc. v. Assam I LLC,* No. 08–CV–442 (TPG)(FM), 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage . . . a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim."); *Sullivan v. City of N.Y.*, No. 14–CV–1334 (JMF), 2015 WL 5025296, at *4 (S.D.N.Y. Aug. 25, 2015), *aff'd*, 690 F. App'x 63 (2d Cir. 2017).

[23] Although this claim is brought by Patrick on AG's behalf, for the sake of clarity, the Court refers only to AG in this section.

[24] As operators of charter schools, the Success Academy Defendants are state actors for purposes of Section 1983 claims. *Scaggs v. N.Y. Dep't of Educ.*, No. 06–CV–799 (JFB)(VVP), 2007 WL 1456221, at *13 (E.D.N.Y. May 16, 2007) ("[T]he Court agrees with the district courts that have held . . . that claims addressing the nature and quality of education received at charter schools may be properly brought against such schools and their management companies under Section 1983.") (collecting cases); *Meadows v. Lesh*, No. 10–CV–223(M) (JJM), 2011 WL 4744914, at *1 (W.D.N.Y. Oct. 6, 2011) ("[A]lthough there is [out-of-circuit] case law to the contrary, charter schools have been held to be state actors for purposes of Section 1983 [in the Second Circuit]."); *cf. Matwijko v. Bd. of Trs. of Glob. Concepts Charter Sch.*, No. 04–CV–663(A) (RJA), 2006 WL 2466868, at *4–5 (W.D.N.Y. Aug. 24, 2006) ("New York statute provides that a

that they violated his Fourteenth Amendment due process rights in connection with his long-term suspensions on February 24, 2017 and September 12, 2017 and the disciplinary process (or lack thereof) provided in connection with those suspensions.[25]

## A. Article 78 Hearing

As an initial matter, Defendants argue that even if the Court could conclude that AG has adequately pleaded that Success Academy's suspension procedures do not satisfy due process, "Plaintiffs cannot state a due process claim when 'there was an adequate state post-deprivation procedure to remedy [P]laintiffs' alleged deprivation of property.'" (Defs.' Br., Dkt. 41, at 17–18 (quoting *J.E. ex rel. Edwards v. Ctr. Moriches Union Free Sch. Dist.*, 898 F. Supp. 2d 516, 546 (E.D.N.Y. 2012)).) In this case, the alleged post-deprivation procedure would be recourse to an

---

charter school is an 'independent and autonomous public school' performing 'essential public purposes and governmental purposes of this state' so as to '[p]rovide parents and students with expanded choices in the types of educational opportunities that are available within the public school system.'") (quoting N.Y. Educ. Law §§ 2850(2)(e) & 2853(1)(c)&(d)) (emphasis omitted). *But see Logiodice v. Trs. of Me. Cent. Inst.*, 296 F.3d 22, 28–32 (1st Cir. 2002) (finding that a private school which operated under a contract with the state and a local school district was not a state actor for purposes of § 1983).

[25] At the pre-motion conference relating to Defendants' motion to dismiss, Plaintiffs confirmed that they were asserting a due process challenge under Section 1983, separate from their due process claim under the IDEA:

THE COURT: "Now the claim, as I understand it, and this is what I want to confirm with the plaintiffs, is that . . . AG, was entitled to [federal due process] procedure or procedures that are to some extent mandated by *Goss* [*v. Lopez*, 419 U.S. 565 (1975)] regardless of his disability, because he was subjected to a lengthy suspension or threatened with a lengthy suspension. Ergo plaintiffs argue that regardless of the provisions of the IDEA, which kicked in, and provided for an alternative educational placement, the minute he was going to be disciplined, and also provided for a hearing, an MDR hearing, he should have also received [] protections under *Goss*. Is that essentially the argument or the theory?"

PLAINTIFFS' COUNSEL: "Yes, Your Honor."

(PMC Tr., at 9:13–10:1.)

Article 78 proceeding. *Horton v. Bd. of Educ.*, No. 5:17–CV–45 (MAD)(ATB), 2017 WL 1437186, at *5 (N.D.N.Y. Apr. 21, 2017) ("Where . . . Article 78 [gives] [p]laintiff a meaningful opportunity to challenge his academic suspension, he [is] not deprived of due process simply because he fail[s] to avail himself of the opportunity."). Admittedly, it is well-settled that "[a]n Article 78 proceeding is adequate for due process purposes even though the petitioner may not be able to recover the same relief that he could in a § 1983 suit." *Hellenic Am. Neighborhood Action Comm. v. City of N.Y.*, 101 F.3d 877, 881 (2d Cir. 1996). However, AG argues that "the availability of an Article 78 proceeding does not bar a § 1983 due process claim where, as here, the violations challenged are systemic." (Pls.' Br., at 22.) The Court agrees with AG and finds that he was not required to request an Article 78 hearing.

Where a plaintiff "alleges that the [d]efendant's procedural due process violations are systematic as opposed to random, the Court [may] find[] that the [p]laintiff was not required to first initiate an Article 78 proceeding before commen[c]ing [a federal court] action." *Reyes v. Cty. of Suffolk*, 995 F. Supp. 2d 215, 228 (E.D.N.Y. 2014); *see also Horton*, 2017 WL 1437186, at *5 ("In certain situations where the alleged violations are systemic, and not isolated and random, the availability of an Article 78 proceeding does not bar a procedural due process claim."); *Pierre v. N.Y.C. Taxi & Limousine Comm'n*, No. 17–CV–973 (MKB), 2017 WL 1417257, at *3 (E.D.N.Y. Apr. 19, 2017) (collecting cases). "[T]he existence of independent state relief does not defeat a Section 1983 claim where the deprivation complained of results from the operation of established state procedures." *Butler v. Castro*, 896 F.2d 698, 700 (2d Cir. 1990); *see also Reid v. City of N.Y.*, 212 F. App'x 10, 11 (2d Cir. 2006) (same). For example, in *Ferrari v. Cty. of Suffolk*, the Honorable Joanna Seybert, in partially denying the defendant's motion to dismiss, found that the plaintiff had sufficiently pleaded a systematic violation where he alleged that the defendant-county

"knowingly train[ed] and/or deliberately permit[ted], the hearing officers who preside[d] over [the relevant] hearings to deliberately and systematically refuse to comport with the requirements of Due Process." 790 F. Supp. 2d 34, 45 (E.D.N.Y. 2011). Later in the case, Judge Seybert partially denied summary judgment finding that, *inter alia*, "[b]ecause the deprivation here is allegedly systemic, and not random, the availability of an Article 78 proceeding does not bar Plaintiff's claim." *Ferrari v. Cty. of Suffolk,* No. 10–CV–4218 (JS)(GRB), 2013 WL 4017022, at *8 (E.D.N.Y. Aug. 6, 2013), *rev'd and remanded on other grounds,* 845 F.3d 46 (2d Cir. 2016), *as amended* (Jan. 4, 2017); *see Reyes*, 995 F. Supp. 2d at 228 (discussing *Ferrari*).

Here, AG alleges that he was, at a minimum, deliberately denied due process in connection with his two long-term suspensions. The Court finds that these allegations sufficiently allege a systematic violation.[26] In *Perez de Leon-Garritt v. State Univ. of N.Y. at Buffalo*, the district court

---

[26] In *Ferrari*, Judge Seybert found that the plaintiff's allegations survived a motion to dismiss and were not conclusory where the claim was "augment[ed]" by the plaintiff's identification, "without the benefit of discovery, of two other instances in which [the defendant's] supposedly neutral hearing officers failed to properly apply [due process]." 790 F. Supp. 2d at 46 ("Three instances (including Plaintiff's own claim) might not suffice to overcome summary judgment. But, at this stage, they do permit a plausible inference of a widespread practice or informal custom within Suffolk County."). Here, AG alleges that he alone was denied due process at least a dozen times in connection with being suspended. (*See* Compl., at ¶ 106 (alleging that "although AG had already been suspended numerous times" over two school years, "the first time AG's parents had ever been offered a hearing to determine whether a suspension was appropriate" was in connection with the September 12, 2017 long-term suspension).) Although the multiple instances where AG was allegedly deprived of due process involved only him, the Court finds these allegations are also sufficient to plead a systematic violation of due process. *Martinez v. N.Y. City Dep't of Educ.*, No. 17–CV–3152(NGG)(CLP), 2018 WL 4054872, at *4 (E.D.N.Y. Aug. 24, 2018) ("While claims of systemic violations are often asserted as part of a class action, they can be made at the individual level, provided a systemic policy is at stake and the administrative officer has no power to correct the violation.") (citation and internal quotation marks omitted). Moreover, although not brought as a due process claim, in *Lawton v. Success Academy Charter Schools, Inc.*, the Honorable Frederic Block has allowed a "systemic discrimination" claim to proceed against Defendant Success Academy Charter Schools, Inc. based on the school's alleged use of "strict disciplinary rules" to "target[] disabled students for removal." 323 F. Supp. 3d 353, 366 (E.D.N.Y. 2018) (finding that Success Academy's use of "daily removals

found that a student could—but did not—sufficiently plead a systematic violation where "she was systemically excluded from her other classes," not just the class where the professor was "act[ing] without authority in excluding her."  No. 14–CV–456(S) (WMS), 2018 WL 1509354, at *5 (W.D.N.Y. Mar. 27, 2018).  In this case, Plaintiffs do not allege that one rogue teacher was frequently suspending AG, particularly since the suspensions have spanned more than one school year; rather, Plaintiffs are alleging that Success Academy's unwritten policy and practice is to suspend students without due process.  Therefore, the Court finds that AG has sufficiently alleged a systematic violation of his due process rights and was not required to resort to an Article 78 hearing.

The Court now turns to the question of what process AG was due in connection with his long-term suspensions on February 24, 2017 and September 12, 2017.

### B. Legal Standard

In order to sustain an action for deprivation of property without due process of law, a plaintiff must "first identify a property right, second show that the state has deprived him of that right, and third show that the deprivation was effected without due process."  *Local 342, Long Island Pub. Serv. Emps. v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994) (emphasis and citation omitted); *see also Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016), *as amended* (Feb. 24, 2016).  The Second Circuit has held that "while there is no federal constitutional right to an education, New York State's education laws 'create a property interest in education protected by the Fourteenth Amendment.'"  *Irwin*, 2017 WL 881850, at *4 (quoting *Handberry v. Thompson*, 446 F.3d 335, 353 (2d Cir. 2006)); *see also S.C.*, 2012 WL 2940020, at *6.  As such,

---

[of], frequent [short-term] suspensions [of], and repeated threats to call the police and ACS on[,] four- and five-year-old[]" disabled students was sufficient to state a claim of "systemic discrimination").

a student such as AG "has a protected property interest in his education, meaning that he could not have been deprived of that right without due process of law." *Horton*, 2017 WL 1437186, at \*3; *see also C.T. v. Valley Stream Union Free Sch. Dist.*, 201 F. Supp. 3d 307, 317–18 (E.D.N.Y. 2016) (same).

The foundational case on the due process rights and procedures required in the school disciplinary context is the Supreme Court's decision in *Goss v. Lopez*, 419 U.S. 565 (1975).[27] In *Goss*, the Supreme Court held that the Due Process Clause of the Fourteenth Amendment required, for "short suspension[s], not exceeding 10 days," that a student be provided the "rudimentary precautions" of "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581, 584. Although the Supreme Court in *Goss* noted that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures," it did not elaborate on what those procedures should entail and, as described *infra*, courts disagree on what the procedures should be. *Id.* at 584. In describing why these procedures are of constitutional import, the Supreme Court stated,

> "education is perhaps the most important function of state and local governments," and the total exclusion from the educational process for more than a trivial period . . . is a serious event in the life of the suspended child. Neither the property interest in educational benefits temporarily denied nor the liberty interest in reputation, which is also implicated,[28] is so insubstantial that suspensions may constitutionally

---

[27] In *Goss*, nine non-disabled students were suspended from their respective Ohio public high schools for up to 10 school days without a hearing. 419 U.S. 569–70. Two of the students were ultimately transferred to another school following their suspensions. *Id.* at 569–70 & nn. 4–5.

[28] The Court will not address whether AG was deprived of a liberty interest since he did not raise the claim. Moreover, AG does not state whether Success Academy violated its disciplinary code in suspending AG, so no due process claim can lie with respect to that issue. *See, e.g.*, *Bates v. Sponberg*, 547 F.2d 325, 329–30 (6th Cir. 1976) ("[I]t is only when the agency's

be imposed by any procedure the school chooses, no matter how arbitrary. . . . The student's interest is to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences.

*Id.* at 576, 579 (quoting *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954)).

However, at the same time, the Supreme Court also recognized that "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and [the Court] ha[s] respected the value of preserving the informality of the student-teacher relationship." *New Jersey v. T.L.O.*, 469 U.S. 325, 339–40 (1985); *see also Bd. of Curators v. Horowitz,* 435 U.S. 78, 88 (1978) ("A school is an academic institution, not a courtroom or administrative hearing room."); *Goss*, 419 U.S. at 578 ("Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. . . . By and large, public education in our Nation is committed to the control of state and local authorities.") (citation omitted); *Tinker*, 393 U.S. at 507 (noting that the Supreme Court "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials"). "The students' interest in 'unfair or mistaken exclusion from the educational process' must be balanced against the school's interest in 'discipline and order.'" *Watson ex rel. Watson v.*

---

disregard of its own rules results in a procedure which in itself impinges upon due process rights that a federal court should intervene in the decisional processes of state institutions."); *Palmer v. Merluzzi*, 689 F. Supp. 400, 412 (D.N.J. 1988) (holding that, in order to rely on a student handbook in stating a due process claim, a plaintiff "must show that he reasonably relied on the student handbook . . . and that his subsequent suspension both violated school rules and caused him to suffer substantially"), *aff'd sub nom. Palmer ex rel. Palmer v. Merluzzi*, 868 F.2d 90 (3d Cir. 1989). Additionally, the Court will also not address whether AG was deprived of a property interest in his short-term suspensions since he also did not raise this issue. However, the Court notes that in *Goss*, the Supreme Court acknowledged "the possibility that in unusual situations, although involving only a short suspension, something more than the rudimentary procedures will be required." 419 U.S. at 584. In *Maldonado v. Illinois State Board of Education*, the Northern District of Illinois found that "suspending [plaintiff] for fifty school days (in a series of 'short suspensions' in a six-month period and then requiring that he repeat fourth grade) may indeed constitute an 'unusual situation' demanding more formal [due process] procedures." No. 01–CV–7757 (RWG), 2003 WL 1713834, at *6 (N.D. Ill. Mar. 28, 2003).

*Beckel*, 242 F.3d 1237, 1240 (10th Cir. 2001) (quoting *Goss*, 419 U.S. at 580). "[T]he interpretation and application of the Due Process Clause are intensely practical matters and . . . '(t)he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'" *Goss*, 419 U.S. at 577 (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)). Ultimately, "[a] concern for fairness pervades *Goss*." *Heyne*, 655 F.3d at 567.

Therefore, the Court needs to answer the following questions with respect to each long-term suspension imposed on AG: (1) was AG deprived of a property interest; and (2) if so, what process was due?[29]

### C. Was AG Deprived of a Property Interest?

Because AG was placed in an IAES during each of his long-term suspensions, there is a serious question as to whether he was deprived of a property interest in connection with those long-term suspensions, as highlighted by this Court in its preliminary injunction decision. *See Patrick*, 2017 WL 6557478, at *4 ("Because AG is a disabled student, he is placed into [alternative instruction] while he is suspended, rather than being subjected to 'total exclusion from the educational process' as a non-disabled student might be.") (quoting *Goss*, 419 U.S. at 576).

While no court has addressed the interplay between the procedural due process requirements of the Fourteenth Amendment and the IDEA, on a more general level, courts have addressed, and disagreed about, whether a suspended student placed into an alternative educational setting is deprived of a property interest and, therefore, may maintain a procedural due process claim. The Second Circuit has held that a disabled child does not have "a right, under the IDEA,

---

[29] A summary of the events and processes associated with each of AG's long–term suspensions can be found in Appendix B.

to graduate . . . from a particular educational institution—specifically, the child's original school rather than an IAES [Interim Alternative Educational Setting]." *Id.* (quoting *Coleman v. Newburgh Enlarged City Sch. Dist.*, 503 F.3d 198, 205–06 (2d Cir. 2007)). But, as this Court noted in its prior decision in this case, "[t]his does not address . . . the question of whether children—disabled or not—have such a right under the *Fourteenth Amendment*." *Id.* (emphasis in original).

Courts have used three very different standards to determine whether a suspended student provided with alternative academic instruction is deprived of a property interest in his or her education. The Second Circuit has not yet ruled on the appropriate standard.

First, courts have found that the suspension itself constitutes a property deprivation. These courts rely on the language from *Goss* stating that "the length and consequent severity of a deprivation, while another factor to weigh in determining the appropriate form of hearing, 'is not decisive of the basic right' to a hearing of some kind." 419 U.S. at 576 (quoting *Fuentes v. Shevin*, 407 U.S. 67, 86 (1972)).[30] Plaintiff urges the Court to adopt this standard, citing to two district

---

[30] *See Robinson v. Stockton Unified Sch. Dist.*, No. 2:16–CV–2111 (KJM)(GGH), 2018 WL 4002860, at *7 (E.D. Cal. Aug. 22, 2018) ("Defendants spend a good bit of argument on their view that under state law, plaintiff was not expelled (requiring a hearing), but was rather suspended or simply referred to another program (not requiring much of anything in the way of due process in their view). This argument misses the point of the above federal case law. Plaintiff has a due process right not to be expelled or suspended without a modicum of process as defined by federal constitutional law.") (emphasis omitted); *B.W. ex rel. Wann v. Vallivue Sch. Dist. No. 139*, No. 1:18–CV–184 (CWD), 2018 WL 2448448, at *9 (D. Idaho May 31, 2018) (finding plaintiff's property interest in attending his school was "minimized," but not extinguished, "by the fact that he likely can earn credits toward graduation during the term of his expulsion by virtually attending accredited online learning academies"); *S.W. ex rel. Walsh v. Rockwood R-VI Sch. Dist.*, No. 4:17–CV–1483 (NCC), 2017 WL 5903984, at *6 (E.D. Mo. Nov. 30, 2017) ("While the gravity of the loss inflicted by [d]efendants is a factor to weigh in determining what process was due [to plaintiff], it does not impact the Court's determination that he was entitled to the basic right of due process. In this case, the Court concludes that although homebound educational services were provided to [plaintiff], thus perhaps minimizing some of the effects of his suspension, [plaintiff]

31

court cases from this circuit. In *Biswas v. City of N.Y.*, the Southern District of New York stated, without analysis, that the plaintiff alleged a deprivation of a property interest even though he "attend[ed] another school, which the plaintiff liken[ed] to a 'reform school,' while the disciplinary charges were pending." 973 F. Supp. 2d 504, 513, 525 (S.D.N.Y. 2013). In the second case, *J.E.*, the Honorable Roslynn R. Mauskopf also found, without elaboration, that the plaintiffs' suspensions "constitute[d] a deprivation of their constitutionally protected right to a public education" even though they were provided with home tutoring during their suspensions. 898 F. Supp. 2d at 533–34, 542.

By contrast, there is a second line of cases in which courts have found that where a student is not deprived of classroom instruction during his or her suspension, the student has not been deprived of a property interest. The reasoning behind these cases also relies on language in *Goss*, reflecting the Supreme Court's concern about the student's "total exclusion from the educational process for more than a trivial period." 419 U.S. at 576. Based on this language, courts have found that "[t]he primary thrust of the educational process is classroom instruction," *Cole ex rel.*

---

was deprived of his protected property interest in attending public school.") (internal citations omitted); *Sandusky v. Smith*, No. 3:10–CV–246(H) (JGH), 2012 WL 4592635, at *6 (W.D. Ky. Oct. 2, 2012) (assuming a deprivation of a property interest where plaintiff was given a 20-day suspension and placed in an alternative school); *T.P.R. ex rel. Patterson-Rudolph v. Montgomery Pub. Sch.,* No. 2:08–CV–813 (WKW), 2009 WL 1098933, at *5 (M.D. Ala. Apr. 23, 2009); *Lee ex rel. E.L. v. Lenape Valley Reg'l Bd. of Educ.*, No. 06–CV–4634 (DMC), 2009 WL 900174, at *6 (D.N.J. Mar. 31, 2009); *Coplin v. Conejo Valley Unified Sch. Dist.*, 903 F. Supp. 1377, 1382 (C.D. Cal. 1995), *aff'd*, 116 F.3d 483 (9th Cir. 1997); *Engele v. Indep. Sch. Dist. No. 91*, 846 F. Supp. 760, 765 (D. Minn. 1994) (rejecting defendants' argument that "because homebound instruction was offered and school work was sent home to [plaintiff], any deprivation of [plaintiff's] right to public education was *de minimis*"); *Everett v. Marcase*, 426 F. Supp. 397, 400 (E.D. Pa. 1977) (finding that students facing a disciplinary transfer are entitled to due process because "[t]he analogy between a transfer for the good of the pupil and a jail sentence for a convicted felon for 'rehabilitation' is not entirely remote"); *cf. Farrell v. Joel*, 437 F.2d 160, 162 (2d Cir. 1971) (holding, pre-*Goss*, "[w]e believe that in these school discipline cases the nature of the sanction affects the validity of the procedure used in imposing it").

*Cole v. Newton Special Municipal Separate Sch. Dist.*, 676 F.Supp. 749, 752 (S.D. Miss. 1987), *aff'd*, 853 F.2d 924 (5th Cir. 1988); *Hillman v. Elliott*, 436 F. Supp. 812, 815 (W.D. Va. 1977) ("Any time a child misses his classes, he is deprived of a learning experience that cannot be repeated."), and, therefore, when "classroom instruction" or its equivalent is provided during a suspension, there is no due process violation.[31]  *But see Smith v. Rector & Visitors of Univ. of Va.*, 115 F. Supp. 2d 680, 685 (W.D. Va. 2000) (finding reliance on *Goss*'s "total exclusion" language "completely mischaracterizes the [Supreme] Court's holding in *Goss*").  Courts in this camp further note that in *Goss* itself, although one of the plaintiffs "had been transferred to another school," the Supreme Court did not find that he was entitled to any additional procedural due process protections other than those he was given in connection with his short-term suspension, implying that no procedural due process protections are required where the punishment is a transfer.  *Donovan*, 68 F.3d at 18 (discussing *Goss*, 419 U.S. at 569 & n.4).  Defendants urge the Court to adopt this standard.  (Defs.' Br., at 15.)[32]  Although not cited by either party, the Court

---

[31] A list of opinions endorsing this position can be found in Appendix C.  It should be noted that, at least in terms of numerosity, this appears to be the dominant view.

[32] Plaintiffs argue that the alternative instruction provided in this case should not constitute a "transfer" for purposes of the property interest analysis because AG was not transferred to another school, but instead given tutoring.  The Court rejects this argument for two reasons.  First, courts have found that even a temporary, rather than permanent, placement in alternative education (such as during a suspension) can still constitute a transfer for due process purposes.  *See, e.g., Harris ex rel. Harris v. Pontotoc Cty. Sch. Dist.*, 635 F.3d 685, 690 (5th Cir. 2011) (sent to an alternative school for 45 days); *Salas v. United Indep. Sch. Dist.*, No. 08–CV–22(L) (GPK), 2009 WL 1035068, at *2 (S.D. Tex. Apr. 17, 2009) (same); *Robinson*, 983 F. Supp. 2d at 839 (student transferred to another school for three months).  Second, although AG's transfer was not from one school to another, but from a traditional school to tutoring in a library, the Court finds that this is a distinction without a difference.  For example, in *Coleman*, the Second Circuit found that the plaintiff did not have the right to graduate from "a particular educational institution—specifically, the child's original school rather than an IAES."  503 F.3d at 205–06.  In that case, the plaintiff's IAES was five hours of home teaching, *id.* at 202 n.5, and the court considered that an equivalent

notes that in *Saggio v. Sprady*, the Honorable Brian M. Cogan held that the plaintiff, who was allegedly "coerced" into being home-schooled after she was assaulted at school, "ha[d] a right under State law to an education, but there is nothing under State law providing that such an education cannot include a home schooling component or assignment to a neighboring school to defuse a discipline problem, and thus there has been no deprivation of a federally protected property right." 475 F. Supp. 2d 203, 210 (E.D.N.Y. 2007).

In the third and final line of cases, courts have found that a student has not been deprived of a property interest where "the sanction imposed is attendance at an alternative school[,] absent some showing that the education received at the alternative school is significantly different from or inferior to that received at his regular public school.'" *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1359 (6th Cir. 1996); (collecting cases); *see also E. S. ex rel. D.K v. Brookings Sch. Dist.*, No. 4:16–CV–4154 (KES), 2018 WL 2338796, at *3–6 (D.S.D. May 23, 2018) (same); *J.K. ex rel. Kaplan v. Minneapolis Pub. Sch.*, 849 F. Supp. 2d 865, 871 (D. Minn. 2011) ("In short, federal courts generally agree that placement in an alternative school does not implicate procedural due process rights unless there is a showing that the education provided by the alternative school is substantially inferior.") (citation and internal quotation marks omitted) (collecting cases); *Chyma v. Tama Cty. Sch. Bd.,* No. 07–CV–56 (JSS), 2008 WL 4145894, at *5 n.27 (N.D. Iowa Sept. 8, 2008) (same).[33] In effect, these courts have found that where the provided alternative education is deficient or inadequate, it can "effectively act[] as an exclusion from the educational process" and "due process rights may be implicated." *Riggan v. Midland Indep. Sch. Dist.*, 86 F. Supp. 2d 647,

"educational institution" to the plaintiff's original school. *See also AW ex rel. Wilson v. Fairfax Cty. Sch. Bd.*, 372 F.3d 674, 676–77 (4th Cir. 2004).

[33] A list of additional opinions adopting this third view can be found in Appendix D.

655 (W.D. Tex. 2000) (finding the plaintiff stated a due process claim where he alleged that the alternative education assignment "significantly affected his educational opportunities"). The only similar case in this circuit is *Mac Ineirghe v. Bd. of Educ.*, in which the Honorable Joseph F. Bianco found that the plaintiff was not deprived of a property interest during a one-day in-school suspension because he "received instruction from a classroom teacher and received his school work." No. 05–CV–4324 (JFB)(AKT), 2007 WL 2445152, at *19 (E.D.N.Y. Aug. 22, 2007).

The Court declines to adopt either of the standards advocated by the parties. Taking into consideration *Goss*'s "total exclusion" language, the Second Circuit's reasoning in *Coleman*, and "[the] concern for fairness [that] pervades *Goss*," *Heyne*, 655 F.3d at 567, the Court adopts the third standard: that placement in alternative education does not deprive a student of a property interest unless the education the student received was materially inferior. Although courts have found that state law does not entitle students to "the best possible education attainable, nor to instruction administered under ideal conditions, nor to academic opportunities which conform[] to any self-acclaimed expert's subjective ideal vision of a perfect education," *Wayne v. Shadowen*, 15 F. App'x 271, 285 (6th Cir. 2001) (emphasis omitted); *Saggio*, 475 F. Supp. 2d at 210, in this case, AG alleges that the alternative education provided to him during both of his long-term suspensions was inferior.

In alleging that the alternative education he received in connection with the first long-term suspension, on February 24, 2017, was inferior, AG points to the fact that it contributed to him "missing enough instructional time to have to repeat the first grade." (Pls.' Br., at 19.)[34] He also

---

[34] Defendants' citation to *Kajoshaj v. City of New York* is inapposite. (Defs.' Br., at 15; Defendants' Reply Brief, Dkt. 42, at 8.) In *Kajoshaj*, Judge Block found that a student being forced to repeat the fifth grade "[did] not amount to an exclusion from the educational process as a whole" and, therefore, did not state a due process violation. No. 11–CV–4780 (FB)(JMA), 2013

states that he was provided with an unlicensed tutor, fewer hours of educational instruction, and no special education services. (Compl., at ¶¶ 87–88.) While it is not clear that the Fourteenth Amendment entitled AG to each of the services that he was allegedly deprived of during his suspension—a licensed tutor,[35] more than two hours of daily education,[36] or his special educational services[37]—Plaintiff alleges that the totality of these deprivations resulted in him being effectively

---

WL 249408, at *4 (E.D.N.Y. Jan. 23, 2013), *aff'd sub nom. Kajoshaj v. N.Y. City Dep't of Educ.*, 543 F. App'x 11 (2d Cir. 2013). However, in *Kajoshaj*, the decision to have plaintiff repeat a grade was purely academic; whereas, here, and as in *Maldonado*, 2003 WL 1713834, at *6, AG argues that he was forced to repeat a grade as a consequence of disciplinary suspension.

[35] It is not clear that, in this case, the use of an unlicensed teacher is inherently inferior to the education AG would have received at Success Academy. Under New York Education Law, up to 30% of New York charter school teachers are permitted to be unlicensed. N.Y. Educ. Law § 2854(a-1). By contrast, some courts have found that alternative education is more likely to be inferior when students who would normally be taught by a licensed teacher are taught by an unlicensed teacher. *E.S. ex rel. D.K*, 2018 WL 2338796, at *4–5 (finding a question of material fact where defendants "[did] not identify whether [the plaintiff's alternative education] tutor was a certified teacher"); *Alabama & Coushatta Tribes of Tex. v. Trs. of Big Sandy Indep. Sch. Dist.*, 817 F. Supp. 1319, 1324 (E.D. Tex. 1993) (finding inadequate alternative education where, *inter alia*, the teacher "[did] not have a teaching certificate"); *cf. Jones v. Long Cty. Sch. Dist.*, No. 2:11–CV–5 (LBW), 2012 WL 3562300, at *5 (S.D. Ga. Aug. 14, 2012) (finding alternative education adequate where the suspension program was "at all times proctored by a duly qualified instructor") (internal quotation marks omitted); *Mac Ineirghe*, 2007 WL 2445152, at *19 (finding no deprivation where the plaintiff "received instruction from a classroom teacher"); *Casey v. Newport Sch. Comm.*, 13 F. Supp. 2d 242, 246 (D.R.I. 1998) (finding no deprivation where the plaintiff was taught by a "qualified" teacher).

[36] *See J.E.*, 898 F. Supp. 2d at 546 ("Previous [New York State Education] Commissioner's decisions have found that two hours of alternative instruction fulfill a district's obligation under the [New York] Education Law.") (citation omitted).

[37] "[T]here is no hard-and-fast rule as to what specific educational services need to be provided in an alternative setting. Rather, the comments appended to the IDEA's implementing regulations defer to state and local definitions of 'general curriculum' for guidance." *Farrin*, 165 F. Supp. 2d at 42. *Compare Doe v. Bd. of Educ. of Oak Park & River Forest High Sch. Dist. 200*, 115 F.3d 1273, 1278 (7th Cir. 1997) ("[T]he only other Circuit until recently to rule on this issue held that if a [disabled] child's misconduct is properly determined in an MD[R] not to be a result of his or her [disability], then the child can be expelled and during the expulsion all educational services may cease.") (citing *Doe v. Maher*, 793 F.2d 1470, 1482 (9th Cir. 1986), *affirmed as*

deprived of the entire educational process.

It is less clear that AG has adequately alleged that he was deprived of a property interest in connection with his second long-term suspension, because AG does not explicitly state whether the alternative education he received was inferior in that instance, as he did with respect to the first suspension. However, AG's IDEA Impartial Hearing Request did demand "compensatory education with related services" for the duration of his suspension, implying that the alternative placement was inadequate. (Compl., at ¶ 119.) Therefore, the Court finds that these allegations are sufficient to establish the deprivation of a property interest with respect to the second long-term suspension.

Accordingly, the Court finds that AG has sufficiently alleged a deprivation of his educational property interest as to both of his long-term suspensions at this stage.[38]

_modified sub nom., Honig v. Doe,_ 484 U.S. 305 (1988)); _Doe,_ 793 F.2d at 1482 ("When a child's misbehavior does not result from his [disability], there is simply no justification for exempting him from the rules, including those regarding expulsion, applicable to other children. Therefore, when a [disabled] child is properly expelled, the school district may cease providing all educational services—just as it could in any other case."); _and J.S. ex rel. Duck v. Isle of Wight Cty. Sch. Bd.,_ 362 F. Supp. 2d 675, 680 (E.D. Va. 2005) ("[A]lthough [plaintiff's mother's] testimony regarding the academic environment at the Alternative School suggested that it may be a less-than-perfect learning environment for a child with learning disabilities, [plaintiff] should pursue the appropriate remedies for modifying [the child's] IEP to attempt to get him more one-on-one time with his teachers") _with Esparza v. Bd. of Trs.,_ 182 F.3d 915, 918 (5th Cir. 1999) ("[S]tate law could create a protected interest in a particular kind of education, such as special education[.]") (emphasis omitted); _and Wise v. Pea Ridge Sch. Dist.,_ 855 F.2d 560, 566 (8th Cir. 1988) (finding the fact that plaintiff "did not have ready access to his special education teacher and resources [was] of no consequence" only because the "Special Education Committee determined that [plaintiff] would not be adversely affected by being placed in the [alternative education] classroom").

[38] If, at summary judgment, Defendants can demonstrate that the alternative education provided to AG was not materially inferior to the education he would have received at Success Academy and, therefore, that AG was not deprived of his property interest, Defendants will still have to demonstrate that they met the short-term suspension requirements of _Goss_ for the four school days AG was suspended without any alternative educational services during the February 24, 2017 suspension. _See Harris,_ 635 F.3d at 690 (holding that although the student's disciplinary

## D. What Process Was AG Due?

Having found the existence of a property interest, the Court must now determine what process was due with respect to AG's two long-term suspensions. *See Goss*, 419 U.S. at 577. "In all cases[,] the inquiry is whether, under the particular circumstances presented, the hearing was fair, and accorded the individual the essential elements of due process." *Gorman v. Univ. of R.I.*, 837 F.2d 7, 16 (1st Cir. 1988) (noting that "[t]he question presented is not whether the hearing was ideal, or whether its procedure could have been better"). Courts have applied three different tests to determine what minimum amount of process is required in the case of a long-term suspension. These tests are based on the following three cases: *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150 (5th Cir. 1961), *Goss v. Lopez*, 419 U.S. 565 (1975), and *Mathews v. Eldridge*, 424 U.S. 319 (1976).

First, in *Dixon*, the Fifth Circuit held that procedural due process requires that a student be notified in writing "of the specific charges" against him, "be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies," and "be given the opportunity to present to the Board [of Education], or at least to an administrative official[,] . . . his own defense against the charges and to produce either oral testimony or written affidavits of witnesses in his behalf." 294 F.2d at 158–59.[39] Second, some courts construe the

---

transfer to an alternative school did not trigger due process protections, his short-term suspension prior to transfer did); *E.S.*, 2018 WL 2338796, at *6 (same). *But see Riggan*, 86 F. Supp. 2d at 655–56 ("For the purposes of th[e] Due Process review, the entire punishment assessed against [plaintiff] must be considered as a whole, not as separate elements."); *Bd. of Ed. v. Illinois State Bd. of Ed.*, 531 F. Supp. 148, 152 (C.D. Ill. 1982) (finding that a one-week suspension of a disabled student "cannot reasonably be described as a change in a [disabled] child's educational placement or termination of educational services to him").

[39] *See, e.g.*, *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 637 n.2 (6th Cir. 2005); *Hammock ex rel. Hammock v. Keys*, 93 F. Supp. 2d 1222 (S.D. Ala. 2000); *Hill ex rel. Hill v. Rankin Cty.*

Supreme Court's decision in *Goss* as establishing "the minimum requirements for long-term expulsions as well [as short-term suspensions].  The minimum requirements established for school expulsions in *Goss* are 'oral and written notice of the charges against [the student] and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.'"  *Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 927 (6th Cir. 1988) (quoting *Goss,* 419 U.S. at 581) (emphasis omitted).[40]  Finally, *Mathews* instructs the courts to balance the following factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  424 U.S. at 335.[41]

The Second Circuit has not established which test to utilize in a school suspension case. *Rubino*, 2007 WL 685183, at *8.

_____

*Sch. Dist.,* 843 F. Supp. 1112 (S.D. Miss. 1993); *Alabama & Coushatta Tribes of Tex. v. Trs. of Big Sandy Indep. Sch. Dist.*, 817 F. Supp. 1319 (E.D. Tex. 1993) *Diggles v. Corsicana Indep. Sch. Dist.*, 529 F. Supp. 169 (N.D. Tex. 1981).

[40] *See, e.g., Lamb v. Panhandle Cmty. Unit Sch. Dist. No.* 2, 826 F.2d 526 (7th Cir. 1987); *Brown v. Univ. of Kan.,* 16 F. Supp. 3d 1275 (D. Kan. 2014), *aff'd*, 599 F. App'x 833 (10th Cir. 2015); *DeFabio v. E. Hampton Union Free Sch. Dist.*, 658 F. Supp. 2d 461 (E.D.N.Y. 2009), *aff'd*, 623 F.3d 71 (2d Cir. 2010); *Foo v. Trs. of Ind. Univ.*, 88 F. Supp. 2d 937 (S.D. Ind. 1999); *Bivens ex rel. Green v. Albuquerque Pub. Sch.*, 899 F. Supp. 556 (D.N.M. 1995); *Baxter v. Round Lake Area Sch.*, 856 F. Supp. 438 (N.D. Ill. 1994).

[41] *See, e.g., Watson ex rel. Watson v. Beckel*, 242 F.3d 1237 (10th Cir. 2001); *Palmer v. Merluzzi*, 868 F.2d 90 (3d Cir. 1989); *Gorman v. Univ. of Rhode Island*, 837 F.2d 7 (1st Cir. 1988); *Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920 (6th Cir. 1988); *Nash v. Auburn Univ.*, 812 F.2d 655 (11th Cir. 1987); *Coplin v. Conejo Valley Unified Sch. Dist.*, 903 F. Supp. 1377 (C.D. Cal. 1995), *aff'd*, 116 F.3d 483 (9th Cir. 1997); *Bogle-Assegai v. Bloomfield Bd. of Educ.*, 467 F. Supp. 2d 236 (D. Conn. 2006).

### 1. February 24, 2017 Suspension

With respect to the February 24, 2017 suspension, the Court need not resolve which test applies because, under any of the three tests, AG has sufficiently alleged that the Success Academy Defendants failed to provide him with adequate due process, since AG was not given a disciplinary hearing at any time in connection with that suspension.[42] *Hess*, 839 F.3d at 674 n.2 (finding that "the problem with the procedures afforded . . . [was] the failure to provide a disciplinary hearing at any time") (emphasis omitted); *see also Panzarella v. Boyle*, 406 F. Supp. 787, 791 (D.R.I. 1975) (finding that plaintiff's "two lengthy, summary suspensions . . . in excess of five months and one month . . . if proved at trial, would obviously exceed in severity the constitutional deprivations recognized in *Goss*"); *Jackson v. Franklin Cty. Sch. Bd.*, 806 F.2d 623, 631 (5th Cir. 1986) (noting that "the fact that [the plaintiff] [i]s a [disabled] student only worsens the consequences of the due process violation that occurred in this case"); *Crawford v. Deer Creek Pub. Sch.*, 228 F. Supp. 3d 1262, 1266–69 (W.D. Okla. 2017).

The Court further finds that, contrary to Defendants' arguments (Defs.' Br., at 16–17), the additional procedural protections afforded to AG under the IDEA do not satisfy constitutional due process requirements for suspensions in excess of 10 school days. "[Disabled] children have a constitutional right to procedural due process independent of the due process rights provided in

---

[42] This case presents an unusual procedural posture in this regard. In every other case involving a public primary or secondary school, the school at issue has been bound by its state education laws, which generally offer more procedural protections than the Fourteenth Amendment requires, and which have been applied in some fashion. *See, e.g.*, *Turof v. Kibbee*, 527 F. Supp. 880, 884 (E.D.N.Y. 1981). Here, because the Success Academy Defendants argue that they are not bound by New York Education Law § 3214, the Court must assess what due process requires in the absence of any other procedural safeguards. *Lopez v. Bay Shore Union Free Sch. Dist.*, 668 F. Supp. 2d 406, 419–20 (E.D.N.Y. 2009) (stating that New York Education Law § 3214(3)(c)(1) "provides certain procedural safeguards to students facing suspensions of more than five days, including the right to reasonable notice, the right to call and examine witnesses, and the right to legal representation").

the [IDEA]." *Kaelin v. Grubbs*, 682 F.2d 595, 602 n.9 (6th Cir. 1982). In other words, the MDR provisions of the IDEA do not satisfy the minimum requirements of due process. As noted above, the IDEA requires that an MDR hearing must be held within 10 school days of the alleged incident to determine whether or not the alleged conduct was a manifestation of the student's disability. The findings of the MDR are subject to appeal, and the State or local educational agency has 20 school days to hold an expedited hearing on the appeal and then another 10 school days within which to issue a decision. 20 U.S.C. § 1415(k)(4). As a result, the entire IDEA process can take up to 40 school days. Thus, while *Goss* entitles a non-disabled student who "poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process" to notice and a suspension hearing "as soon as practicable" after a suspension has been ordered, 419 U.S. at 582–83; *see also O'Neal v. Alamo Cmty. Coll. Dist.*, No. 08–CA–1031 (XR), 2010 WL 376602, at *10 (W.D. Tex. Jan. 27, 2010), the IDEA, in effect, permits a decision to be rendered on AG's long-term suspensions as late as 40 school days after the suspensions are imposed, which cannot be deemed "as soon as practicable." *See Goss*, 419 U.S. at 582–83.[43]

Moreover, in *Goss*, the Supreme Court was concerned with ensuring that accused students are able to fairly and accurately present their "side of the story." 419 U.S. at 581; *Porter v. Ascension Par. Sch. Bd.*, 393 F.3d 608, 624 (5th Cir. 2004) ("[O]ne of the primary purposes of [disciplinary] hearings is that of confirming whether the student threatened with expulsion actually committed the conduct for which he is being punished."). By contrast, "[t]he manifestation determination team typically does not determine the facts of the incident for which an eligible

---

[43] While "[i]t would be anomalous indeed for a federal court to dictate an exact number of days within which a formal hearing must be held by the school," *Bivens ex rel. Green*, 899 F. Supp. at 563 ("'The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation[.]'") (quoting *Goss*, 419 U.S. at 578–79), the Court finds that 40 days is too long in this case.

student is subject to discipline." *Bristol Twp. Sch. Dist.v. Z.B.*, No. 15–CV–4604 (SRD), 2016 WL 161600, at *4 (E.D. Pa. Jan. 14, 2016); *see also Danny K. ex rel. Luana K. v. Dep't of Educ.*, No. 11–CV–25 (ACK), 2011 WL 4527387, at *12 & n.20 (D. Haw. Sept. 27, 2011) ("Plaintiffs cite no authority, and the Court has found none, to suggest that a manifestation determination team must review the merits of a school's findings as to how a student violated the code of student conduct. . . . [T]he IDEA was not intended to provide disabled students an additional avenue with which to challenge a school's underlying findings of misconduct."). *But see Farrin*, 165 F. Supp. 2d at 42 (finding that the "functional difference" between the IDEA suspension provisions and "generally applicable school [disciplinary] rules" is "largely semantic . . . due to the procedural protections in place for children with disabilities who are removed from school for more than ten days"). "[S]tudents in our public school systems, who may . . . face a daunting punishment, should at least be afforded a thorough review of their case, prior to imposition of penalty." *Colvin ex rel. Colvin v. Lowndes Cty. Sch. Dist.*, 114 F. Supp. 2d 504, 512 (N.D. Miss. 1999).

Therefore, the Court finds that AG has stated a due process claim with respect to his first long-term suspension, on February 24, 2017.[44]

---

[44] The Court notes that even if Defendants ultimately establish that AG did commit the acts in question, *Patrick*, 2017 WL 6557478, at *2, "under due process considerations, failure on the part of [Defendants] to afford a hearing is not excused by later proof that the student is guilty of the offense charged." *Doe v. Rockingham Cty. Sch. Bd.*, 658 F. Supp. 403, 407 (W.D. Va. 1987); *see also Betts v. Bd. of Educ. of Chi.*, 466 F.2d 629, 633 (7th Cir. 1972) ("[S]chool authorities [a]re plainly required to give the plaintiff and her parent some opportunity to present a mitigative argument."). This is true even though Defendant Solomon both witnessed the incident and issued the suspension. *Butler v. Oak Creek–Franklin Sch. Dist.*, 172 F. Supp. 2d 1102, 1114 (E.D. Wis. 2001) ("There are two purposes to a disciplinary hearing: To decide whether a rule violation actually occurred; and, if a rule violation actually did occur, to determine the appropriate punishment. . . . Thus, even if a school official him[or her]self witnessed the conduct forming the basis for the charge against a student, the student [must] at least have the opportunity to characterize his conduct and put it in what he deems the proper context before a final decision is made.") (internal quotation marks and citations omitted). *But see Keough v. Tate Cty. Bd. of Educ.*,

## 2. September 12, 2017 Suspension

With respect to the second long-term suspension on September 12, 2017, the Court finds that it would apply the *Mathews* balancing test, but, as discussed *infra*, the settled caselaw makes doing so unnecessary. AG's due process claim with respect to this suspension is complicated by the fact that Success Academy provided him with a hearing (entirely separate from, and in addition to, his MDR under the IDEA), for the purpose of determining whether AG had, in fact, engaged in any misconduct. AG nonetheless challenges the hearing process that he was afforded, alleging that it did not satisfy the minimum requirements of due process. The Court analyzes each of the claimed deficiencies in that process in turn.

### a. Hearing Transcript or Recording

AG alleges that his due process rights were violated because "no verbatim record or recording of the hearing relating to the September 12, 2017 suspension was maintained" (Compl., at ¶¶ 109, 118), thereby denying him "the option to pursue a meaningful suspension appeal that could [have] include[d] review of any evidence relied upon and credibility determinations made," (Pls.' Br., at 21). However, AG has cited no case law to support his claim that due process requires a hearing transcript or recording.

Although "several courts have required some form of record," "the absence of a written

---

748 F.2d 1077, 1083 (5th Cir. 1984) (finding no procedural due process violation where there was "substantial evidence" to support a finding that the student was guilty); *Porter ex rel. LeBlanc v. Ascension Par. Sch. Bd.*, 301 F. Supp. 2d 576, 593–94 (M.D. La. 2004) (collecting cases), *aff'd sub nom. Porter v. Ascension Par. Sch. Bd.*, 393 F.3d 608 (5th Cir. 2004); *Achman v. Chi. Lakes Indep. Sch. Dist. No. 2144*, 45 F. Supp. 2d 664, 671–72 (D. Minn. 1999) ("Even if the Defendants acted in violation of [plaintiff's] procedural due process rights, [plaintiff] has made no showing that, by denying him the opportunity to present his version of the facts, he was prejudiced in any way. [Defendant] was not suspending [plaintiff] based upon the report of a third-party accuser, but rather based on conduct that she personally observed. Thus, even if [plaintiff] had denied the conduct, there is little doubt that he still would have been suspended.").

transcript has not been a ground for reversing disciplinary action." *Gorman*, 837 F.2d at 15; *see also Flaim*, 418 F.3d at 635–36 ("While due process may not impose upon the [school] the requirement to produce a record in all cases, fundamental fairness counsels that if the [school] will not provide some sort of record, it ought to permit the accused to record the proceedings if desired.")[45]; *Watson*, 242 F.3d at 1242–43 (rejecting plaintiff's contention that he was entitled to a transcript of the hearing because "precedent indicate[s] that due process does not require . . . th[is] right[]"); *Doe v. Bd. of Educ.*, No. 96–4008, 1998 WL 344061, at *4 (6th Cir. 1998) ("There is no support for [a]ppellant's assertion that defendants in expulsion hearings must be allowed to tape record the proceedings, but we do acknowledge that in general, long-term suspensions, expulsions for the balance of the school term or permanent expulsions do require more formal procedures, not unlike a written record. . . . [However,] [w]e have not found any support for the notion that a party subject to an eighty day expulsion must be allowed to tape record the expulsion proceedings.") (unpublished); *Knoch v. Univ. of Pittsburgh*, No. 2:16–CV–970 (CRE), 2016 WL 4570755, at *6 (W.D. Pa. Aug. 31, 2016) (finding plaintiff "point[ed] to no legal authority, nor . . . ma[d]e a legal argument" that the defendant-university had to "maintain a complete record of

---

[45] AG does not allege that he, his parents, or his counsel asked to record the proceedings, which some courts have found to be an independent basis for dismissing this claim. (Compl., at ¶ 118 (stating that plaintiffs' counsel requested "a copy of the transcript of the suspension hearing from Defendants" *after* the hearing)); *see Coronado v. Valleyview Pub. Sch. Dist. 365-U*, 537 F.3d 791, 796 (7th Cir. 2008) (finding no due process violation where, *inter alia*, "there [was] no evidence in the record that [the student] asked during the expulsion hearing that a verbatim record be made"); *Czeremcha v. E. Airlines, Inc.*, No. 80–CV–3783 (LBS), 1980 WL 2186, at *3 (S.D.N.Y. Nov. 25, 1980) ("Finally, in and of itself, the lack of a transcript of petitioner's hearing before the [disciplinary] [b]oard does not amount to a due process violation, especially in light of petitioner's conceded failure to request that a transcript be made."); *cf. Slaughter v. Brigham Young Univ.*, 514 F.2d 622, 625 (10th Cir. 1975) (holding where plaintiff asked, and was permitted, to tape the disciplinary hearing, due process was satisfied). *But see Gonzales v. McEuen*, 435 F. Supp. 460, 469 (C.D. Cal. 1977) ("It is not the student's obligation to wrest due process from the defendants, but rather, it is the defendants' obligation to provide it.").

44

[p]laintiff's disciplinary proceeding"); *Anderson v. Hillsborough Cty. Sch. Bd.,* No. 8:08–CV–772 (TBM), 2009 WL 3669634, at *6 (M.D. Fla. Oct. 30, 2009) (finding no due process violation where the school board did not tape record the disciplinary hearing), *aff'd*, 390 F. App'x 902 (11th Cir. 2010); *Baxter v. Round Lake Area Sch.*, 856 F. Supp. 438, 445 (N.D. Ill. 1994) (rejecting plaintiff's argument that he was denied due process because a court reporter was not present at his expulsion hearing, and finding that the "Seventh Circuit has stated that a school expulsion hearing need not follow the formal procedures of a judicial or quasi-judicial trial to survive due process challenges"); *Carey ex rel. Carey v. Me. Sch. Admin. Dist. No. 17*, 754 F. Supp. 906, 920 (D. Me. 1990) ("The absence of a written transcript is generally not considered to be a ground for reversing disciplinary action, although some record is required."); *Jaksa v. Regents of Univ. of Mich.*, 597 F. Supp. 1245, 1252 (E.D. Mich. 1984) ("I am not persuaded that the due process clause requires the [school] to provide a verbatim transcript of the hearing. While this case illustrates the wisdom of recording such hearings, it is clear that the Constitution does not impose such a requirement."), *aff'd*, 787 F.2d 590 (6th Cir. 1986). Furthermore, while due process "may require at least the ability to create a record of the proceeding," *Ohio State Univ.*, 219 F. Supp. 3d at 657, AG does not allege that he was denied such a right.

Here, AG did receive "some form of record," albeit a scant one.[46] In the complaint, AG

---

[46] In fact, the Court notes that Defendants' two-page "IAES Hearing Findings Sheet" contains the least amount of detail of any judicially-reported school suspension case. *See, e.g.*, *Coronado*, 537 F.3d at 796–97 (providing a six-page hearing summary with "considerable detail"); *Gorman*, 837 F.2d at 15–16 (providing "[a] record of each hearing, comprised of a summary of the testimony and evidence presented and of the decision rendered"); *Carey*, 754 F. Supp. at 920 (providing "a partial transcript, a detailed letter from the hearing officer/superintendent of schools detailing the findings at the hearing and the bases for the expulsion, and voluminous documentary evidence supporting those findings and conclusions"); *cf. Escatel v. Atherton*, No. 96–CV–8589 (JB), 1997 WL 264345, at *2 (N.D. Ill. May 8, 1997) (finding due process does not require a transcript where "a fair summary of the hearing evidence" exists). *But see Flaim*, 418 F.3d at 636

acknowledges that he received an "IAES Hearing Findings Sheet" with a checked box indicating that he had "[i]nflicted serious bodily injury upon on another person" and a finding that his behavior "included punching the paraprofessional with two fists, slapping the paraprofessional in the face, pulling the paraprofessional's hair and either throwing a pencil or using a pencil to stab the eye of the paraprofessional.  In either case[,] the paraprofessional sustained an injury which required medical care."  (Compl., at ¶ 118 (quoting Dkt. 7-4, at ECF 52–54).)

While AG has cited cases holding that the provision of a hearing transcript or record satisfies due process (Pls.' Br., at 20–21), he has not cited any cases holding that the failure to have them does *not*.  *See, e.g.*, *Hess*, 839 F.3d at 677 (holding that the procedural safeguards given to the plaintiff were "constitutionally adequate" even though there was no verbatim transcript or hearing summary); *Jahn v. Farnsworth*, 617 F. App'x 453, 461 (6th Cir. 2015) (same).[47]

While the Court finds disconcerting Success Academy's failure to "create a contemporaneous record of the only fact finding proceeding in its disciplinary process, ostensibly rendering a *de novo* review impossible," there is simply no legal authority that would require Success Academy to "maintain a complete record of Plaintiff's disciplinary proceeding."  *Knoch*,

--- 

("An accused individual is generally not entitled to a statement of reasons for a decision against them, at least where the reasons for the decision are obvious."); *Ohio State Univ.*, 219 F. Supp. 3d at 657 ("The student is generally not entitled to a reasoned opinion supporting the decision against them.").

[47] Additionally, Plaintiff's citation to *Appeal of T.S.*, (Pls.' Br., at 21.), a New York State Education Department decision challenging a suspension decision under New York Education Law § 3214, based on the lack of an intelligible hearing record, is unavailing.  57 Ed. Dep't Rep., Decision No. 17233, 2017 WL 5228708, at *3 (Oct. 27, 2017).  "[A] violation of state law . . . is not a denial of due process, even if the state law confers a procedural right."  *Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993).  Therefore, "[a]lthough [AG was] not afforded the process described under N.Y. Educ. Law § 3214, [he was] afforded the process due under the Constitution."  *Mac Ineirghe*, 2007 WL 2445152, at *19; *see also DeFabio*, 658 F. Supp. 2d at 492–93*; Cohn v. New Paltz Cent. Sch. Dist.,* 363 F. Supp. 2d 421, 492 (N.D.N.Y. 2005), *aff'd in part*, 204 F. App'x 56 (2d Cir. 2006).

2016 WL 4570755, at *6 (rejecting due process claim based on incomplete record of disciplinary proceeding) (emphasis omitted); *see also Doe*, 1998 WL 344061, at *4 (finding that plaintiff was not entitled to "specific findings of fact" and that "an abbreviated form of the hearing summary derived from the superintendent's expulsion proceedings" was sufficient to satisfy due process) (internal quotation marks omitted); *McDonald ex rel. McDonald v. Sweetman*, No. 3:02–CV–1040 (MRK), 2004 WL 717166, at *4 (D. Conn. Mar. 24, 2004) ("[Plaintiff] was given oral notice of the charges against her, an opportunity to present her version of the facts, and an explanation, however feeble, of the evidence against her. That is all the process that is required under the Constitution."). Therefore, Defendants' motion to dismiss is granted as to AG's due process claim based on Defendants' failure to provide a transcript of his September 12, 2017 suspension hearing in its entirety. [48]

### b. Sworn Testimony

AG alleges that his due process rights were violated because "[n]o oaths were taken prior to testimony being offered." (Compl., at ¶ 109.) However, "[c]ourts have generally been unanimous . . . in concluding that . . . neither rules of evidence nor rules of civil or criminal procedure need be applied [to school suspension hearings], and witnesses need not be placed under oath." *Flaim*, 418 F.3d at 635–36 (citations omitted) (collecting cases); *Sykes v. Sweeney*, 638 F. Supp. 274, 279 (E.D. Mo. 1986) (finding meritless plaintiff's argument that "the school board hearing procedures were flawed because the witnesses were not sworn nor were the formal rules of evidence followed"). AG has not cited any cases to the contrary. Therefore, Defendants' motion to dismiss is granted as to AG's claim that he was deprived of due process based on

---

[48] However, as the Court notes *infra*, the lack of a more thorough record does weigh in Plaintiffs' favor in the sufficiency of the evidence analysis.

Defendants' failure to place witnesses under oath at the September 12, 2017 suspension hearing.

### c. Testimony by the Para-Professional

The Court construes the complaint as alleging that because the para-professional who was allegedly injured did not testify at the September 12, 2017 hearing, Defendants failed to meet their burden of proof to justify AG's suspension.[49] (Compl., at ¶ 110; Pls.' Br., at 19–20.) "Although the Second Circuit has not specifically addressed the issue of the sufficiency of the evidence in school disciplinary proceedings, the Court assumes . . . that the [school's] disciplinary action must be supported by substantial evidence in order to comport with due process." *Rubino*, 2007 WL 685183, at *8; *see also Keough*, 748 F.2d at 1083 (applying the "substantial evidence" standard); *Bd. of Educ. v. Mills*, 741 N.Y.S.2d 589, 591 (3d Dep't 2002) ("[A]ppellate courts in this State have uniformly held that the competent and substantial evidence standard of proof is appropriate in student suspension proceedings.") (collecting cases).[50] Substantial evidence is "'more than a

---

[49] To the extent AG argues that Defendants committed a *per se* violation of his due process rights because the para-professional did not testify, that claim fails. AG does not allege that he, his parents, or their counsel "attempt[ed] to call [the para-professional] (and so could not have been denied the claimed right)." *Smartt v. Clifton*, No. 3:96–CV–389 (WHR), 1997 WL 1774874, at *18 (S.D. Ohio Feb. 10, 1997); *see also Coronado*, 537 F.3d at 796 ("The record contains no evidence that [appellant] ever asked that either [witness] be required to appear and give testimony, so it is difficult to imagine how he was denied the opportunity."); *Tasby v. Estes*, 643 F.2d 1103, 1106 (5th Cir. 1981) ("The plaintiffs have made no showing that any student has ever been denied the right to bring a necessary witness before the [school] Hearing Board."); *Werner v. Bd. of Educ.*, No. 11–CV–1095 (JPG), 2012 WL 3562619, at *4 (S.D. Ill. Aug. 16, 2012) ("[P]laintiff cannot complain [he] was denied the opportunity to cross-examine witnesses when plaintiff did not even attempt to gain their presence at the hearing.").

[50] *But see McDonald ex rel. McDonald, v. Sweetman*, No. 3:02–CV–1040 (MRK), 2004 WL 717166, at *4 (D. Conn. Mar. 24, 2004) ("'It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion. . . . The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members, and § 1983 was not intended to be a vehicle for federal-court corrections of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees.'

mere scintilla;' it is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rubino*, 2007 WL 685183, at *8 n.5 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The Court finds that AG has stated a due process claim based on Defendants' alleged failure to meet their evidentiary burden. "The failure of [a school] to call essential witnesses may . . . have a direct bearing on whether it can sustain its burden of proof[.]" *Gonzales*, 435 F. Supp. at 468; *Eley v. Morris*, 390 F. Supp. 913, 924 n.4 (N.D. Ga. 1975) (finding that the purpose of a *Goss*-type hearing is to alert the disciplinarian "to the existence of disputes about facts and arguments about cause and effect," including by "summon[ing] the accuser" so "his discretion will be more informed and . . . the risk of error substantially reduced"). Here, the entire disciplinary hearing centered on credibility; yet (1) the only person (other than AG) who witnessed the incident—the para-professional—did not testify, (2) neither Principal Solomon nor AG's teacher "[saw] the para[-professional] in extreme pain or . . . observ[ed] any injury,"[51] (3) AG's father saw the allegedly injured para-professional immediately after the incident and she appeared uninjured, and (4) no medical records were introduced.[52] (Compl., at ¶¶ 110–15.) While hearsay, such as the index card signed by the allegedly injured para-professional, is admissible in school suspension cases, *Tasby*, 643 F.2d at 1106, the Court finds that there is a question as to whether it, in

---

Moreover, the Second Circuit's decision in *Rosenfeld* [*v. Ketter*, 820 F.2d 38 (2d Cir. 1987)] suggests that a student's opportunity to present his or her side of the story is sufficient process even if the decisionmaker explicitly states . . . that the story will not be credited.") (quoting *Wood v. Strickland*, 420 U.S. 308, 326 (1975)).

[51] However, at the MDR Hearing, AG's teacher "stated that she saw the student hit the para[-professional]." (Compl., at ¶ 121.)

[52] At the MDR Hearing, Success Academy stated "that on the day of the incident, the para[-professional] was released from the hospital immediately and was treated for a migraine." (Compl., at ¶ 122.)

conjunction with the scant findings of fact—which do not contain any findings as to credibility—are sufficient to meet the "substantial evidence" standard to justify AG's suspension. Therefore, Defendants' motion to dismiss is denied as to AG's due process claim based on Defendants' failure to meet their burden of proof at the September 12, 2017 suspension hearing.

*    *    *

Accordingly, the Court concludes that AG has stated due process claims with respect to both of his long-term suspensions, on February 24, 2017 and September 12, 2017. The former claim is based on Defendants' failure to conduct a suspension hearing, as required by *Goss*, while the latter claim is based on Defendants' alleged failure to meet their burden of proof at the hearing to show that AG had engaged in the alleged misconduct for which he was suspended.

## IV.    ADA/Rehabilitation Act

Plaintiffs argue that the totality of the behavior by the Success Academy Defendants was tantamount to discrimination and retaliation under the ADA and Rehabilitation Act. (*See, e.g.*, Compl., at ¶ 93 (alleging that Success Academy "called EMS to harass, scare, intimidate, and retaliate against [Patrick] for enforcing her rights . . . and to force AG out of the school due to his disability").) Under Title II of the ADA and Section 504 of the Rehabilitation Act, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; 29 U.S.C. § 794. Thus, "[t]o state a *prima facie* discrimination claim under either the ADA or the Rehabilitation Act, . . . [a plaintiff] must allege: '(1) that he is a qualified individual with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to

his disability." *Fulton v. Goord,* 591 F.3d 37, 43 (2d Cir. 2009) (quoting *Hargrave v. Vermont*, 340 F.3d 27, 34–35 (2d Cir. 2003)) (internal alterations omitted). "Courts in this Circuit have recognized that a Section 504 [and/or ADA] claim may be predicated on the claim that a disabled student was denied access to a free appropriate education, as compared to the free appropriate education non-disabled students receive" if there is "proof of bad faith or gross misjudgment." *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 840–41 (2d Cir. 2014) (citation and internal quotation marks omitted) (collecting cases).

To state a claim for retaliation under the ADA or Rehabilitation Act, a plaintiff must show: "(i) [he or she was] engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Lawton*, 323 F. Supp. 3d at 366 (quoting *Weixel v. Bd. of Educ.*, 287 F.3d 138, 148 (2d Cir. 2002)).

## A. Exhaustion

Defendants argue that Plaintiffs should have to first exhaust their administrative remedies with respect to any ADA/Rehab Act claim pursuant to the *IDEA's* exhaustion requirement. (Defs.' Br., at 7–14.) "[P]otential plaintiffs with grievances related to the education of disabled children generally must exhaust their administrative remedies before filing suit in federal court, even if their claims are formulated under a statute other than the IDEA (such as the ADA or the Rehabilitation Act)." *Polera v. Bd. of Educ.*, 288 F.3d 478, 481 (2d Cir. 2002). Plaintiffs argue that, under the Supreme Court's decision in *Fry v. Napoleon Community Schools*, 137 S. Ct. 743 (2017), the IDEA exhaustion requirement does not apply to their ADA/Rehab Act claims.

The IDEA, as described *infra*, requires the exhaustion of its administrative remedies for claims brought pursuant to other federal laws if such claims "seek[] relief that is also available

under" the IDEA.  20 U.S.C. § 1415(*l*).  In *Fry*, the Supreme Court clarified the nature of this

requirement:  "[T]o meet [20 U.S.C. § 1415(*l*)], a suit must seek relief for the denial of a FAPE

[free appropriate public education], because that is the only relief the IDEA makes available."  137

S. Ct. at 752 (internal quotation marks omitted).  The test outlined in *Fry* for when a claimant must

exhaust the IDEA's administrative remedies asks whether "the gravamen of a complaint against a

school concerns the denial of a FAPE."  *Id*. at 756.  If so, plaintiffs must exhaust the IDEA's

administrative remedies.  *Id*.  However, where the gravamen of a plaintiff's suit is something other

than a FAPE, such as "disability-based discrimination," the exhaustion requirement is

inapplicable.  *Id*.  The Court in *Fry* gave some guidance for determining whether "the gravamen

of a complaint against a school concerns the denial of a FAPE, or instead addresses disability-

based discrimination," in the form of two hypothetical questions:

> First, could the plaintiff have brought essentially the same claim if the alleged
> conduct had occurred at a public facility that was *not* a school—say, a public theater
> or library? . . . [S]econd, could an *adult* at the school—say, an employee or
> visitor—have pressed essentially the same grievance?
>
> When the answer to those questions is yes, a complaint that does not expressly
> allege the denial of a FAPE is also unlikely to be truly about that subject; after all,
> in those other situations there is no FAPE obligation and yet the same basic suit
> could go forward. But when the answer is no, then the complaint probably does
> concern a FAPE, even if it does not explicitly say so; for the FAPE requirement is
> all that explains why only a child in the school setting (not an adult in that setting
> or a child in some other) has a viable claim.

*Id*. (emphasis in original).

*Fry* itself concerned a disabled student who claimed that the elementary school she

attended had violated her rights under Title II of the ADA and § 504 of the Rehabilitation Act for

refusing to accommodate her service animal.  *Id*. at 752.  While the Supreme Court did not apply

its newly-crafted standard, instead choosing to remand the case for further consideration, it gave

some indication, albeit in dicta, of how the analysis ought to play out:

> [Plaintiffs'] complaint alleges only disability-based discrimination, without making any reference to the adequacy of the special education services [the] school provided. . . . The complaint contains no allegation about the denial of a FAPE or about any deficiency in [the disabled student's] IEP [Individualized Education Plan]. More, it does not accuse the school even in general terms of refusing to provide the educational instruction and services that [the student] need[ed].

*Id*. at 758. Thus, as "nothing in the nature of the [plaintiffs'] suit suggest[ed] any implicit focus on the adequacy of [the student's] education," the Supreme Court indicated that the IDEA's exhaustion requirement likely did not apply to those particular ADA/Rehab Act claims. *Id.*

While the Second Circuit has yet to interpret *Fry*, two cases from this district provide further guidance. In the first, *Martinez v. New York City Department of Education*, the Honorable Nicholas G. Garaufis held that ADA/Rehab claims alleging a failure to provide a reasonable accommodation for the plaintiff's nut allergy were subject to the IDEA's exhaustion requirement. No. 17–CV–3152 (NGG)(CLP), 2018 WL 4054872, at *5 (E.D.N.Y. Aug. 24, 2018). In applying *Fry*, Judge Garaufis first took notice of the fact that the plaintiff's complaint explicitly alleged that defendants had violated the IDEA by failing to provide plaintiff with a FAPE. *Id.* Next, Judge Garaufis considered the two questions posed in *Fry*, answering each in the negative: "As to the first question, the right that [d]efendants are said to have violated is specifically based on [plaintiff's] status as a student to whom special-education services are owed. As to the second question, the DOE does not have an obligation to provide special-education services to adult employees or visitors—just students." *Id.* Judge Garaufis concluded that the ADA/Rehab Act claims were subject to the exhaustion requirement and dismissed them for failure to exhaust. *Id.*

The second case, *Lawton v. Success Academy Charter Schools, Inc.*, involved one of the Defendants in this action. 323 F. Supp. 3d 353 (E.D.N.Y. 2018). In that case, the plaintiffs, five students with disabilities, brought ADA/Rehab Act claims alleging that a former Success Academy principal had maintained a "Got to Go" list, which was intended to remove the plaintiff-students

and other disabled students from the school. The plaintiffs alleged that, pursuant to this policy, the former principal deliberately targeted and discriminated against disabled students, segregated disabled students from other students in the class, and repeatedly suspended disabled students. *Id.* at 362. In applying *Fry*, Judge Block held the claims to be outside of the IDEA's exhaustion requirement:

> [W]hile plaintiffs' allegations occasionally touch on denial of a FAPE and failure to reasonably accommodate the students, the vast majority of the allegations, and thus the gravamen of the complaint, concern intentional discrimination and retaliation. . . . These allegations extend far beyond simple denial of a FAPE. The two questions posed by *Fry* support this conclusion. The disabled children would have a claim against a public library that placed them on a list of excluded patrons, used strict disciplinary rules to remove them on a daily basis, and threatened to call the police when faced with complaints about the mistreatment. So would disabled adults.

*Id.*

Here, viewed in the light most favorable to Plaintiffs, as the non-moving party, the ADA/Rehab Act claims Plaintiffs advance are beyond the reach of the IDEA's exhaustion requirement. *J.S., III, ex rel. J.S. Jr. v. Houston Cty. Bd. of Educ.*, 877 F.3d 979, 986 (11th Cir. 2017) (holding, post-*Fry*, allegations that a disabled student was repeatedly removed from class could not be analyzed simply as a FAPE violation but were "cognizable as a separate [ADA/Rehab Act] claim for intentional discrimination"). The allegations in Plaintiffs' complaint, like those in *Lawton*, "touch on" the denial of a FAPE and invoke the language of the IDEA. (*See, e.g.*, Compl. at ¶¶ 163, 170 ("Defendants, in failing to reasonably accommodate AG's disabilities by failing to provide him with an *appropriate education*, have discriminated against AG on the basis of his disability.") (emphasis added)); *see Martinez*, 2018 WL 4054872, at *5. However, as was also the case in *Lawton*, Plaintiffs' ADA/Rehab Act claims primarily concern allegedly discriminatory suspension processes and the allegedly retaliatory calling of EMS or threats to do so. (Compl., at

¶ 172.) Plaintiffs additionally allege that Defendants ultimately prevented AG from returning to school at the end of the first semester of the 2017–2018 school year based on the false accusation that AG had "a bedbug" on his clothing. (*Id.* at ¶¶ 132–33.)

Although this case differs from *Lawton* in that there is no smoking-gun evidence of discrimination or retaliation here, application of the two-question *Fry* inquiry yields substantially the same answers as in *Lawton*: (1) the repeated and unnecessary calling of EMS on a disabled student at a public library or on a disabled adult employed at Success Academy could form the basis of a claim under the ADA/Rehab Act, as could (2) the intentionally discriminatory administration of disciplinary procedures, including suspension or expulsion, as applied to a disabled student at a public library or a disabled adult working at Success Academy. *Lawton*, 323 F. Supp. 3d at 362; *Fry*, 137 S. Ct. at 756. Thus, the Court finds that the gravamen of Plaintiffs' ADA/Rehab Act claims does not concern the denial of a FAPE and that AG's ADA/Rehab Act claims are not subject to the IDEA exhaustion requirement.

## B. Merits

In light of this Court's holding that Plaintiffs' ADA/Rehab Act claims are not subject to exhaustion and Defendants' failure to brief the merits of these claims, Defendants' motion to dismiss is denied as to Plaintiffs' ADA/Rehab Act claims.

## V.    IDEA Claims[53]

Plaintiffs allege that the Success Academy Defendants violated the IDEA in four ways: (1) Defendants falsely alleged that AG inflicted "serious bodily injury . . . in order to circumvent the MDR process and bar AG from attending school;" (2) Defendants "failed to provide appropriate alternative education or an appropriate IAES" while AG was suspended; (3) during the second suspension, Defendants failed to allow AG to return to school after an MDR found that his behavior was a manifestation of his disability; and (4) Defendants failed to follow disciplinary due process requirements as set forth in the IDEA.  (Compl., at ¶¶ 152–54.)  Defendants argue that Plaintiffs have failed to administratively exhaust these claims under the IDEA and, therefore, they should be dismissed.  (Defs.' Br., at 7–15.)  The Court will address each of these claims, and the concomitant exhaustion requirement, if any, in turn.

### A.  Exhaustion

#### 1.  Overview of the IDEA's Exhaustion Requirement

"The IDEA provides federal grants to states so that they may in turn provide disabled children with 'a free appropriate public education [("FAPE")]' in the least restrictive, appropriate environment."  *TC v. Valley Cent. Sch. Dist.*, 777 F. Supp. 2d 577, 599 (S.D.N.Y. 2011) (citing 20 U.S.C. §§ 1400(d)(1)(A), 1401(8), 1411(a)(1) & 1412(a)(5)(A)), *on reconsideration sub nom. DC v. Valley Cent. Sch. Dist.*, No. 7:09–CV–9036 (WWE), 2011 WL 3480389 (S.D.N.Y. June 29, 2011).  To enforce rights "relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education," the

---

[53] To the extent that Plaintiffs are seeking monetary damages for violations of the IDEA, the Court construes those claims as being brought under Section 1983.  *Polera*, 288 F.3d at 483 & n.5 ("[T]his Court has found damages to be an available remedy in actions brought pursuant to 42 U.S.C. § 1983 for violations of the IDEA[.]").

IDEA also provides for a federal cause of action "in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy." 20 U.S.C. §§ 1415(b)(6)(A) & (i)(2). But before bringing a federal action for an IDEA violation, there is "a broadly applicable requirement that plaintiffs first exhaust administrative remedies." *Polera*, 288 F.3d at 483. "A plaintiff's failure to exhaust administrative remedies under the IDEA deprives a court of subject matter jurisdiction." *Id.*

However, "the exhaustion requirement does not apply in situations in which exhaustion would be futile." *Coleman*, 503 F.3d at 204–05 (citation and internal quotation marks omitted). "To show futility, a plaintiff must demonstrate that 'adequate remedies are not reasonably available' or that 'the wrongs alleged could not or would not have been corrected by resort to the administrative hearing process.'" *Id.* at 205 (quoting *J.G. ex rel. Mrs. G. v. Bd. of Educ.*, 830 F.2d 444, 447 (2d Cir. 1987)). The burden of demonstrating futility "rests with the party seeking to avoid the exhaustion requirement." *Id.*

### 2. Applicable IDEA Exhaustion Standard

Defendants argue that each of Plaintiffs' IDEA claims should be dismissed for lack of subject matter jurisdiction due to Plaintiffs' failure to exhaust the IDEA's requisite administrative remedies. (Defs.' Br., at 7–15.) Plaintiffs, by contrast, contend that pursuant to *Fry*, exhaustion of their claims is not necessary because the claims do not arise from the denial of a FAPE even though they are explicitly brought under the IDEA. (Pls.' Br., at 2–12.) In the alternative, Plaintiffs argue that they have exhausted the relevant administrative remedies, and to the extent they have not, doing so would be futile. (*Id.*) Because the Court finds that Plaintiffs have established that exhaustion of their IDEA claims would have been futile, the Court does not decide

whether the standard enunciated in *Fry* is applicable here.[54]  The Court discusses each of Plaintiffs'
IDEA claims in turn.

### B.  Misuse of the "Serious Bodily Injury" Exception

Plaintiffs allege that Defendants violated the IDEA by falsely accusing AG of inflicting
"serious bodily injury" on two occasions—February 24, 2017 and September 12, 2017—in order
to justify removing AG from Success Academy during the IDEA hearing process.  (Compl., at ¶¶
81, 140, 144, 153.)

#### 1.  Exhaustion

As discussed, the parties disagree as to whether this claim is subject to the IDEA's
exhaustion requirement and the extent to which the requirement has been satisfied.  Because the
Court finds, for the reasons set forth below, that further exhaustion of these claim would be futile,
it need not decide which exhaustion standard applies.

##### a.  February 24, 2017 Incident

First, Plaintiffs allege that Defendants misused the "serious bodily injury" exception to

---

[54] To be sure, whether to subject Plaintiffs' IDEA claims to the standard established in *Fry*
is an unsettled and complicated legal question.  *K.C. v. Chappaqua Cent. Sch. Dist.*, No. 16–CV–
3138 (KMK), 2018 WL 4757965, at *19 (S.D.N.Y. Sept. 30, 2018) (describing the application of
*Fry* as a "difficult question").  On the one hand, the text of the IDEA sets out administrative
remedies ostensibly designed to resolve disputes arising from the implementation of the statute.
The "broadly applicable requirement that plaintiffs first exhaust administrative remedies" would
indicate that all claims brought pursuant to the IDEA be subject to exhaustion, save those as to
which exhaustion would be futile.  *See Polera*, 288 F.3d at 483.  On the other hand, the reasoning
of *Fry* suggests that how a claim is pleaded is less important than the nature of the relief sought.
Defendants argue that because Plaintiffs seek declaratory and monetary relief explicitly for IDEA
violations, *Fry* is of no relevance and its standard inapplicable.  Although the Court has construed
Plaintiffs' request for monetary damages for the alleged procedural violations of the IDEA as being
made under § 1983, "[a] plaintiff cannot evade the IDEA's exhaustion requirement simply by
framing his or her action as one for monetary relief." Thus, it is unclear the degree to which *Fry*
changed the exhaustion analysis for IDEA violations brought as § 1983 actions.  *See Polera*, 288
F.3d at 488.

unlawfully keep AG out of school in connection with the February 24, 2017 incident and the resulting suspension.  (*Id.*)  Plaintiffs raised this contention in the IHO hearing.  (Dkt. 7-4, at ECF 38–39.)  The IHO substantively agreed with Plaintiffs and found that the "serious bodily injury" exception did not apply:

> The basis for the allegation that A.G. inflicted serious bodily injury on February 24, 2017 . . . do[es] not rise to the level of serious bodily injury as that term is defined in the law.  Rather, I agree with the parent that [the alleged] conduct even if true, which I doubt, could not create a substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily organ, or mental faculty.

(*Id.* at ECF 40 (citing 20 U.S.C. § 1415(k)(7)(D)).)  Neither party appealed this decision to the SRO. (Compl., at ¶ 86.)

Plaintiffs persuasively argue that they had no reason, let alone obligation, to appeal a decision favorable to them.  (Pls.' Br., at 7–8.)  The Court agrees.  Under the IDEA, only a "party aggrieved by the findings and decision rendered in such a hearing may appeal such findings and decision to the State educational agency."  20 U.S.C. § 1415(g)(1); *see also Quackenbush v. Johnson City Sch. Dist.,* 716 F.2d 141, 146 (2d Cir. 1983).  Here, Plaintiffs were not "aggrieved" by the favorable finding of the IHO and any further appeal of the claim would have been pointless. *See R.B. ex rel. L.B. v. Bd. of Educ.*, 99 F. Supp. 2d 411, 415–16 (S.D.N.Y. 2000) (exhaustion would be "pointless" where plaintiff prevailed at the impartial hearing, even where "she did not entirely agree with the decision of the hearing officer").[55]

---

[55] Defendants' argument that Plaintiffs should have appealed the favorable outcome to the SRO in order to bind Success Academy to the judgment is inconsistent and disingenuous. Defendants argue, on the one hand, that they are not bound by the IHO's decision finding that they violated the IDEA, but then turn around and argue that Plaintiffs were required to go through the IHO/SRO system to exhaust their IDEA claims.  For the reasons already discussed, the Court need not resolve either issue.

### b. September 12, 2017 Incident

Plaintiffs bring a similar claim regarding a false allegation of "serious bodily injury" with respect to the September 12, 2017 suspension. Once again, an IHO hearing was held in which Plaintiffs raised this and other claims. (Compl., at ¶ 130.) Unlike in the first hearing, the IHO did not rule on Plaintiffs' claims regarding the appropriateness of the suspension (including the "serious bodily injury" claim) and instead held that "[the] issue must . . . be explored through appeal of the suspension hearing and upon that record." (Dkt. 7-4, at ECF 59.) However, the IHO opined, "on the record before me[,] it is highly unlikely the [serious bodily injury] standard was met, and I have reached this same conclusion recently in another matter involving this same student and school." (*Id.*)

Once again, it is difficult to see what more Plaintiffs could have done within the framework of the IDEA administrative remedies. Here, despite essentially agreeing with the position taken by Plaintiffs, the IHO held that the forum was inadequate for the resolution of claims relating to the appropriateness of the suspension. Rather, the IHO opined that appeal of the suspension hearing conducted by Success Academy—which Plaintiffs had already done—was the only avenue Plaintiffs could pursue for relief. "[E]xhaustion is not necessary under the IDEA where it would be futile to resort to the due process procedures or where 'it is improbable that adequate relief can be obtained by pursuing administrative remedies (e.g., the hearing officer lacks the authority to grant the relief sought).'" *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 789 (2d Cir. 2002) (quoting *Mrs. W. v. Tirozzi*, 832 F.2d 748, 756 (2d Cir. 1987)); *see also Heldman ex rel. T.H. v. Sobol*, 962 F.2d 148, 159 (2d Cir. 1992) (holding that "it would be an exercise in futility to require [plaintiff] to exhaust the state administrative remedies" where plaintiff challenged a state administrative procedure, and the hearing officer would not have had the authority to alter the procedure).

Because the IHO held the claims based on Defendants' alleged misuse of the "serious bodily injury" exception were beyond the scope of the IDEA hearings, further exhaustion through those processes would have been futile. *See J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 114 (2d Cir. 2004) (plaintiffs' problem could not have been remedied where the nature of the complaint was incapable of correction by the hearing process).

Given that exhaustion would have been futile for both of Plaintiffs' "serious bodily injury" claims, relating to the February 24, 2017 and September 12, 2017 suspensions, the Court need not determine whether exhaustion of these claims is required under *Fry*. The Court, therefore, turns to the merits of Plaintiffs' claim.

### 2. Merits

Plaintiffs claim that Defendants violated the IDEA by intentionally exploiting the "serious bodily injury" exception—through false or exaggerated claims that AG had inflicted "serious bodily injury" to Defendants' staff—to bypass the IDEA's "stay-put" provision. That provision requires the school to allow a disabled student who is accused of a disciplinary infraction to remain in his then-current educational placement until all of the IDEA proceedings have been completed. 20 U.S.C. § 1415(k)(4)(A). Under the "serious bodily injury" exception, the student may be removed to an IAES for up to 45 school days, regardless of whether the behavior is determined to be a manifestation of the child's disability or not. 20 U.S.C. § 1415(k)(1)(G)(iii). Plaintiffs claim that Defendants abused the "serious bodily injury" provision so that they could justify removing AG from Success Academy during the IDEA hearing process. (Compl., at ¶¶ 140, 144, 153.) Defendants' only response is that AG, in fact, inflicted serious bodily injury and, thus, Success Academy could not have been abusing the exception, given that AG's removals were justified. (Defs.' Br., at 4–6.)

This claim appears to be one of first impression. The Court has identified only one similar case. In *O'Hayre v. Board of Education*, the plaintiffs "asserted a claim for abuse of IEP process under the IDEA, [based on] excessive IEP meetings, misstatement of the purpose of those meetings, and using the meetings as a tool of harassment." 109 F. Supp. 2d 1284, 1287, 1290–91 (D. Colo. 2000) (citation and internal quotation marks omitted). The District of Colorado found that the plaintiffs had failed to state a cause of action, holding that "[a]lthough the IDEA does allow for administrative and judicial review of school decisions and civil enforcement actions to enforce its provisions, the statute does not address misuse of the IEP process. The IDEA specifies what an IEP team must accomplish, but does not limit the IEP in the scope of their discussions or decisions." *Id.* at 1291 (citation omitted).

*O'Hayre* is distinguishable from, yet provides support for, the claim presented here. In contrast to *O'Hayre*, Plaintiffs do not allege misuse of the IEP process or challenge decisions of the IEP team. Instead, Plaintiffs seek "judicial review of school decisions," which *O'Hayre* found "the IDEA does allow." *Id.*[56] Plaintiffs are challenging the decisions of the school administrators in how they implement the requirements of the IDEA with respect to discipline. Moreover, unlike in *O'Hayre*, Plaintiffs argue that Defendants "did not meet their statutory mandate" under the IDEA, *id.*, when they illegally, and intentionally, bypassed the IDEA's "stay-put" provision. If, as is alleged, Defendants are improperly invoking the "serious bodily injury" provision, they are unilaterally changing AG's educational placement and improperly keeping him out of Success Academy during the entirety of his suspension or the IDEA administrative process, which, as discussed *supra*, can take up to 40 school days. *Honig*, 484 U.S. at 327 ("[O]ne of the purposes

---

[56] There is no indication in the record that AG's IEP team reviewed Defendants' use of the serious bodily injury provision as part of the MDR process.

of [the stay-put provision] . . . [is] 'to prevent school officials from removing a child from the regular public school classroom over the parents' objection pending completion of the review proceedings.'") (quoting *Sch. Comm. of Burlington v. Dep't of Educ.,* 471 U.S. 359, 373 (1985)) (emphasis omitted).  Allowing Plaintiffs to proceed on this claim is consistent with "Congress' unquestioned desire to wrest from school officials their former unilateral authority to determine the placement of emotionally disturbed children." *Id.* at 321.  Because these provisions of the IDEA, in particular, are inextricably intertwined with significant due process interests, the Court finds that Plaintiffs should not be precluded from seeking judicial enforcement of them.

Defendants' argument that this claim should be dismissed because AG, in fact, inflicted "serious bodily injury" on both occasions misses the point.  At this stage, the issue is whether Plaintiffs have sufficiently plead their claim that Defendants abused the IDEA's "serious bodily injury" exception.  Plaintiffs allege that Defendants intentionally misused the IDEA disciplinary process to produce unfounded determinations that AG inflicted "serious bodily injury"—a claim that is supported, in part, by an IHO.  Defendants cannot prevent this claim from proceeding simply by insisting that those allegedly corrupt determinations were correct; that is what discovery and trial are for.

Accordingly, the Court finds that Plaintiffs have stated a claim under the IDEA for abuse of the "serious bodily injury" exception.[57]

---

[57] In reaching this conclusion, the Court recognizes the tension between the protection of AG's rights under the IDEA and Defendants' interests in protecting their students from harm and themselves from related liability.  As the Supreme Court observed in *Goss*, "there are recurring situations in which prior notice and hearing cannot be insisted upon.  Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school." 419 U.S. at 582; *see Nevares v. San Marcos Consol. Indep. Sch. Dist.*, 111 F.3d 25, 26 (5th Cir. 1997) (stating that the Fourteenth Amendment allows students to be "removed from the regular classroom" by a school "for reasons of safety and

order"). However, under the IDEA, an MDR must be held within 10 days, and if a student's conduct is found to be a manifestation of his or her disability, the student is supposed to be immediately returned to their school unless the school appeals the manifestation determination or the serious bodily injury exception applies. 20 U.S.C. §§ 1415(k)(1)(F), (3)(A) (stating that a school may request an impartial due process hearing under the IDEA if it "believes that maintaining the current placement of the child is substantially likely to result in injury to the child or to others").

The disconnect here is between the "serious bodily injury" exception of the IDEA and the "continuing danger" exception of the Fourteenth Amendment. Under the IDEA, serious bodily injury is defined very narrowly as "bodily injury which involves a substantial risk of death; . . . extreme physical pain; . . . protracted and obvious disfigurement; . . . or protracted loss or impairment of the function of a bodily member, organ, or mental faculty." 18 U.S.C. § 1635(h)(3). By contrast, although "[t]he case law applying the 'continuing danger' exception to the due process requirement for a pre-suspension hearing is sparse," *Wells v. Columbus Tech. Coll.*, No. 4:11–CV– 79 (CDL), 2012 WL 1300276, at *5 (M.D. Ga. Apr. 16, 2012), *aff'd*, 510 F. App'x 893 (11th Cir. 2013), it is clearly a more flexible standard than that for "serious bodily injury." *See, e.g.*, *Hess*, 839 F.3d at 674 & n.2 (finding a student was a "continuing danger" where he was accused of aggravated battery); *C.B. ex rel. Breeding v. Driscoll*, 82 F.3d 383 (11th Cir. 1996) (fighting, screaming obscenities, and assaulting faculty members); *Medlock v. Trs. of Ind. University*, No. 1:11–CV–977 (TWP)(DKL), 2011 WL 4068453, at *7–8 (S.D. Ind. Sept. 13, 2011) (growing and keeping marijuana in a dorm room); *O'Neal*, 2010 WL 376602, at *9–10 (threatening to commit a school shooting); *Anderson v. Hillsborough Cty. Sch. Bd.*, No. 8:08–CV–772(T) (TBM), 2009 WL 3669634, at *6 (M.D. Fla. Oct. 30, 2009) (allegedly striking an assistant principal as well as screaming, belligerence, and physical aggression), *aff'd*, 390 F. App'x 902 (11th Cir. 2010); *Alexander v. Underhill*, No. 3:05–CV–178 (LRH)(RJJ), 2008 WL 822261, at *10 (D. Nev. Mar. 26, 2008) (fighting); *Nguyen v. Univ. of Louisville*, No. 3:04–CV–457(H), 2006 WL 1005152, at *4 (W.D. Ky. Apr. 14, 2006) (sexual harassment); *Pullen v. Moore*, No. 05–CV–4368, 2005 WL 2850124, at *3 (N.D. Ill. Oct. 26, 2005) (disabled student threatening his aide with a thumb tack); *Craig v. Selma City Sch. Bd.*, 801 F. Supp. 585, 590–91 (S.D. Ala. 1992) (brawling in the principal's office).

Therefore, in some circumstances, a school could be required to allow a disabled student who did not inflict "serious bodily injury," but is a "continuing danger," to return to school, or else risk being held liable under the IDEA for improperly keeping the student out of school. This potentially puts the school in the difficult position of weighing the safety of the student body against the monetary liability for violating the rights of a disabled student. However, the Supreme Court has held that this tension is an intentional feature of the IDEA: "[I]n enjoining the state and local defendants from indefinitely suspending . . . or otherwise unilaterally altering [a disabled student's] then current placement, [the court] properly balance[s the student's] interest in receiving a free appropriate public education in accordance with the procedures and requirements of the [IDEA] against the interests of the state and local school officials in maintaining a safe learning environment for all their students." *Honig*, 484 U.S. at 328.

### C. Provision of Appropriate Alternative Instruction

Plaintiffs argue that, in connection with the first suspension, the Success Academy Defendants did not provide AG with an IAES, as defined by the IDEA, but instead "merely offered AG the same inadequate alternative instruction they provide to all non-disabled students—two hours of general education tutoring with an unlicensed tutor in a public library with no related services or paraprofessional." (Pls.' Br., at 6, 18 & n.10.) According to Plaintiffs themselves, they challenged the adequacy of the alleged IAES placements through the IDEA process and "[i]n each of th[o]se proceedings, . . . obtained the full relief available against the [New York City Department of Education]," i.e., "receiv[ing] compensatory education and make-up related services for AG." (*Id.* at 7 & n.5.) Because Plaintiffs have received complete relief under the IDEA itself, the Court construes their claim as only seeking relief pursuant to Section 1983 for this violation of the IDEA.

#### 1. Exhaustion

As noted above, *Fry* held that for claims that could be brought under the IDEA, where the gravamen of plaintiff's suit is something other than a FAPE, exhaustion of the IDEA's administrative remedies is not necessary. 137 S. Ct. at 756. Plaintiffs argue that the "crux" of their complaint is "Defendants' imposition of long-term suspensions without adequate due-process safeguards, not the denial of a [FAPE]." (Pls' Br., at 10–13.) However, the claim that the alternate education provided by Defendants was inadequate is quite squarely a claim concerning "the denial of a FAPE." *Fry*, 137 S. Ct. at 756. Thus, even assuming that the reasoning of *Fry* extends to claims brought pursuant to the IDEA directly, claims regarding the adequacy of the IAES are still subject to exhaustion.

Therefore, the Court must next determine whether Plaintiffs have satisfied the IDEA's exhaustion requirement, or, to the extent that they have not, whether the futility exemption applies.

For the following reasons, the Court finds that further exhaustion of Plaintiffs' claims regarding the adequacy of the IAES would have been futile and thus denies Defendants' motion to dismiss these claims for failure to exhaust.

### a. February 24, 2017 Incident

Plaintiffs' request for an IHO hearing following the suspension arising from the February 24, 2017 incident contains as a reason for the request: "The IAES placement is inappropriate and not likely to provide FAPE." (Dkt. 18-2, at ECF 2.) However, there is no record that the issue was addressed during the IHO hearing itself. (Dkt. 7-4, at ECF 36–41.) Even so, because the decision of the IHO was favorable to Plaintiffs, the Court finds that further appeal of the IHO decision would have been futile. In other words: (1) the issue of the adequacy of the IAES was brought to the attention of the IHO; and (2) although the IHO did not address that issue, Plaintiffs still received the relief they sought.[58] Like Plaintiffs' claims regarding the misuse of the "serious bodily injury" exception, Plaintiffs ultimately were not "aggrieved" by the findings of the IHO with respect to the IAES placement, and had nothing to appeal. *See* 20 U.S.C. § 1415(g); *see also Quackenbush*, 716 F.2d at 147.

### b. September 12, 2017 Incident

Plaintiffs similarly raised the issue of the adequacy of the IAES in their request for an IHO concerning the suspension from the September 12, 2017 incident. (Dkt. 18-4, at ECF 2 ("The IAES placement is inappropriate and not likely to provide FAPE. The alternative instruction and the alternative education IAES notice and placement are in violation of Federal and State education law.").) This time, the IHO *did* address the claim in the hearing held on the suspension: "[t]he

---

[58] At the hearing, Plaintiffs requested that "AG be reinstated to his current placement at Success Academy and receive compensatory services for the unlawful suspension." The IHO ordered both. (Dkt. 7-4, at ECF 39–41.)

parent also complained that the instruction A.G. received in the IAES was inappropriate and no related services were provided." (Dkt. 7-4, at ECF 57.) The IHO went on to find that:

> A.G. received 2 hours per day (40 hours total) of instruction at the IAES. There was no dispute that the instruction provided was by a general education teacher. Accordingly, . . . A.G. is entitled to 40 hours of special education instruction by a licensed special education teacher as compensation.

(*Id*. at ECF 58–59 (citing *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 522 (D.C. Cir. 2005)).).

Once again, Plaintiffs had no obligation, for the purposes of exhaustion, to further appeal this favorable decision. *See* 20 U.S.C. § 1415(g); *see also Quackenbush.*, 716 F.2d at 147.[59] Because further exhaustion would be pointless, this claim is not dismissed for failure to exhaust administrative remedies. *R.B.*, 99 F. Supp. 2d at 415–16 (exhaustion would be "pointless" where plaintiff prevailed at the impartial hearing).

### 2. Merits

In light of this Court's holding that Plaintiffs' IAES adequacy claims are not subject to exhaustion and Defendants' failure to brief the merits of this claim, Defendants' motion to dismiss is denied as to this claim.

### D. Failure to Return AG to School

In connection with the second suspension, Plaintiffs argue that Defendants violated AG's rights under the IDEA "by refusing to allow AG to return to school after an MDR found that his behavior was a manifestation of his disability." (Compl., at ¶ 154.) Under the IDEA, school

---

[59] At the IHO hearing, Plaintiffs requested "special education instruction as a compensatory remedy and related services" as well as sought "to have the record of [AG's] suspension expunged because the suspension hearing that was held deprived [him] of due process." (Dkt. 7-4, at ECF 57–59.) The IHO ordered compensatory relief, but did not address the request that AG's record be expunged. (*Id.*)

personnel may "remove a student to an [IAES] for not more than 45 school days *without regard to whether the behavior [at issue] is determined to be a manifestation of the child's disability*," *inter alia*, "where a child has inflicted serious bodily injury upon another person while at school." 20 U.S.C. § 1415(k)(1)(G) (emphasis added). The Court finds that this claim is duplicative of Plaintiffs' "serious bodily injury" claim and, therefore, is dismissed.

### E. Deprivation of Due Process Rights

Finally, Plaintiffs argue that "Defendants' failure to follow disciplinary due process requirements is a violation of Plaintiffs' rights under the IDEA." (*Compl.*, at ¶ 152.) The Court construes this claim as alleging that, in connection with the February 24, 2017 suspension, the deprivation of Plaintiffs' Fourteenth Amendment Due Process rights also constituted a violation of the IDEA. Under the IDEA, where the suspension is longer than 10 days and the conduct is not a manifestation of the child's disability, "the relevant disciplinary procedures applicable to children without disabilities may be applied to the child in the same manner and for the same duration in which the procedures would be applied to children without disabilities." 20 U.S.C. § 1415(k)(1)(C); *see also D.W. ex rel. Williams v. Chesterfield Cty. Sch.*, No. 3:17–CV–679 (MHL), 2018 WL 3098121, at *7 (E.D. Va. June 5, 2018), *report and recommendation adopted*, No. 3:17–CV–679 (MHL), 2018 WL 3097017 (E.D. Va. June 22, 2018).[60] In this case, the relevant procedures to be applied "in the same manner and for the same duration" as to children without disabilities is a hearing that complies with federal due process requirements.[61]

---

[60] This claim is only being applied to the February 24, 2017 suspension because the conduct that led to the September 12, 2017 suspension was found to be a manifestation of his disability, and therefore, 20 U.S.C. § 1415(k)(1)(C) does not apply.

[61] This claim is substantively identical to AG's Section 1983 due process claim, but subject to the IDEA's exhaustion requirement.

## 1.  Exhaustion

The Court first decides whether this claim is subject to the IDEA's exhaustion requirement. Plaintiffs allege that Defendants failed to afford AG the requisite due process guaranteed by the IDEA (in addition to the Fourteenth Amendment) in suspending AG for the February 24, 2017 incident without ever holding a suspension hearing.  Defendants' only response is that this claim is subject to the IDEA's exhaustion requirements because the gravamen of Plaintiffs' complaint concerns the denial of a FAPE, and remains unexhausted.  (Defs.' Br., at 7–14.)  The Court disagrees based on the futility of exhaustion.

Plaintiffs raised this claim in the IHO hearing on March 28, 2017.  (Compl., at ¶ 82.)  The IHO found that "[t]he issue of the failure of Success Academy and the DOE to provide the parent with notice and an opportunity for a suspension hearing . . . subverts meaningful due process proceedings under the [IDEA.]"  (Dkt. 7-4, at ECF 39.)  However, the IHO went on to hold that he "[did] not have jurisdiction to order a suspension hearing in [the] matter[.]"  (*Id.*)  Thus, Plaintiffs were left with a favorable IHO decision—in that Plaintiffs got the relief they were seeking—albeit on alternate grounds.  As with Plaintiffs' claim arising from alleged misuse of the "serious bodily injury" exception, further appeal of a favorable IHO decision on this claim would have been futile.  *See R.B.*, 99 F. Supp. 2d at 415–16 (exhaustion "pointless" where plaintiff prevailed at the impartial hearing, even where "she did not entirely agree with the decision of the hearing officer"); *Taylor*, 313 F.3d at 789; *see also Comm. of Blind Vendors v. District of Columbia*, 695 F. Supp. 1234, 1239–40 (D.D.C. 1988) (in non-IDEA case, exhaustion futile when agency that holds hearing has no jurisdiction to decide the case), *rev'd on other grounds*, 28 F.3d 130 (D.C. Cir. 1994).

Thus, even assuming exhaustion is required, Plaintiffs' statutory due process claim has satisfied the IDEA's exhaustion requirement under the futility doctrine.

## 2. Merits

The Court now turns to the merits of this claim. There is scant caselaw—none of which has been cited or referenced by either party—analyzing this provision of the IDEA. Moreover, no Court of Appeals has definitively ruled on whether the "may be applied" language of 20 U.S.C. § 1415(k)(1)(C) is mandatory, and, therefore, provides the basis for a cause of action under the IDEA. However, in *Doe ex rel. Doe v. Todd County School District*, the Eighth Circuit held that after it was determined that the child's misconduct was not a manifestation of his disability,

> the IDEA gave the [IEP] team two significantly different procedural alternatives for dealing with the situation. First, the team could have let school officials apply generally applicable disciplinary procedures and suspend Doe "in the same manner and for the same duration in which the procedures would be applied to children without disabilities." This would result in a purely disciplinary proceeding to which the due process protections of *Goss*. . . would apply. . . . Alternatively, the IEP team could act more affirmatively, as [the child's team] did in this case, by changing the disabled child's placement from the school which suspended him to an alternative educational setting. However, under 20 U.S.C. § 1415(j), the IDEA's "stay-put" provision—an important procedural safeguard—the IEP team could not take this action without the parent's consent.

625 F.3d 459, 463–64 (8th Cir. 2010) (quoting 20 U.S.C. § 1415(k)(1)(C)). Additionally, the Fifth Circuit held that "under the [Education for All Handicapped Children Act of 1975, the IDEA's predecessor,] or the Fourteenth Amendment, school officials were required to provide [the child] with notice and a hearing regarding his continued exclusion from school." *Jackson v. Franklin Cty. Sch. Bd.*, 806 F.2d 623, 631 (5th Cir. 1986); *see also C.C. v. Hurst-Euless-Bedford Indep. Sch. Dist.*, No. 4:14–CV–1042(A) (JM), 2015 WL 2443835, at *6 (N.D. Tex. May 21, 2015) (holding that the relevant inquiry "is whether the disciplinary procedures were applied to plaintiff by the District in the same way that such procedures would have been applied to any other student

within the District" and stating that "the relevant disciplinary procedures applicable to children without disabilities *are* applied to the child in the same manner and for the same duration") (emphasis added), *aff'd*, 653 F. App'x 808 (5th Cir. 2016); *Ocean Twp. Bd. of Educ. v. E.R. ex rel. O.R.*, No. 13–CV–1436 (AET), 2014 WL 936738, at *3 (D.N.J. Mar. 10, 2014) (discussing the Seventh Circuit's decision in *Bd. of Educ. v. Ill. State Bd. of Educ.*, 103 F.3d 545, 548 (7th Cir. 1996), which "suggested" that where the child's behavior was not caused by his or her disability, "the disciplinary measures of the school[] were warranted"); *Dohmen ex rel. Dohmen v. Twin Rivers Pub. Sch.*, 207 F. Supp. 2d 972, 979 (D. Neb. 2002) ("[T]he facts alleged would also support a claim that the school district violated the IDEA because the disciplinary procedures of [Nebraska state law] authorizing the expulsion of a student for possessing a weapon or endangering other students[] were not applied to [plaintiff] in the same manner in which they [were] applied to children without disabilities.") (citations and internal quotation marks omitted); *Farrin,* 165 F. Supp. 2d at 42 ("A finding that the behavior was not a manifestation clears the way for the school to discipline the child pursuant to generally applicable school rules."); *cf. Stuart v. Nappi*, 443 F. Supp. 1235, 1243 (D. Conn. 1978) ("Handicapped children are [not] immune from a school's disciplinary process."). These decisions suggest that where the IEP team does not voluntarily consent to a change in placement, as was the case here, the school *must*, pursuant to the IDEA, conduct a Fourteenth Amendment due process hearing.[62]

The Court finds that, in light of the fact that AG's IEP team did not voluntarily consent to, or affirmatively propose or effect, a change in AG's placement during his February 24, 2017

---

[62] The Court acknowledges that this interpretation does not comport with the plain language of the IDEA—which seems to indicate permissive application of the normal disciplinary procedures—but the Court reads this provision in conjunction with the due process requirements established in *Goss*. *Todd Cty. Sch. Dist.*, 625 F.3d at 463–64.

suspension, Plaintiffs have sufficiently alleged a violation of the IDEA based on Defendants' failure to provide AG with a *Goss*-type hearing, discussed *supra*, as "would be applied to children without disabilities." 20 U.S.C. § 1415(k)(1)(C).[63]

## CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss is granted in part and denied in part. The following claims will move forward against the Success Academy Defendants:

(A) ADA and Rehabilitation Act retaliation and discrimination claims by Plaintiffs

(B) In connection with the February 24, 2017 suspension:

    (1) Fourteenth Amendment Due Process (Failure to hold a due process hearing) by AG

    (2) IDEA (Adequacy of the IAES) by Plaintiffs

    (3) IDEA (Misuse of the serious bodily injury exception) by Plaintiffs

    (4) IDEA (Deprivation of due process rights) by Plaintiffs

(C) In connection with the September 12, 2017 suspension:

    (1) Fourteenth Amendment Due Process (Sufficiency of the evidence) by AG

    (2) IDEA (Adequacy of the IAES) by Plaintiffs

    (3) IDEA (Misuse of the serious bodily injury exception) by Plaintiffs

---

[63] After discovery, it may become apparent that Success Academy does not have an established disciplinary process for non–disabled students. (*See* February 28, 2018 Hearing Transcript, Dkt. 29, at 11:21–12:3, 12:23–14:7 ("[I]t appears that there's—that there's very limited circumstances in which long-term suspensions have been imposed by defendants other than on our client, and it's not clear what the criteria are. There's very little information in terms of guidelines or policies or anything that's provided to parents to indicate when those kinds of punitive measures will be—or not—will not be taken."); Pls.' Br., at 20 ("[W]hile Defendants have represented to the Court that they have implemented a suspension hearing process and are committed to using such procedures in the future with respect to AG *as well as other students*, at this stage there is no evidence that Defendants have instituted any such procedures.") (emphasis added).) However, at this stage, the Court does not consider Success Academy's potentially universal failure to be a defense to the IDEA's due process requirement suggested by the complaint and as discussed above.

(4) IDEA (Deprivation of due process rights) by Plaintiffs

The remaining claims are dismissed. Defendants de Jongh, Cole, Shainker, and Solomon are terminated from this action.

SO ORDERED.


/s/Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: December 14, 2018
     Brooklyn, New York

# APPENDIX A

## Applicable Provisions of the IDEA, 20 U.S.C. § 1415

**(a)** ESTABLISHMENT OF PROCEDURES

Any State educational agency, State agency, or local educational agency that receives assistance under this subchapter shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies.

**(b)** TYPES OF PROCEDURES

The procedures required by this section shall include the following:

**(1)** An opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child.

. . .

**(3)** Written prior notice to the parents of the child, in accordance with subsection (c)(1), whenever the local educational agency—

**(A)** proposes to initiate or change; or

**(B)** refuses to initiate or change, the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child.

. . .

**(6)** An opportunity for any party to present a complaint—

**(A)** with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child; and

. . .

**(f)** IMPARTIAL DUE PROCESS HEARING

**(1)** IN GENERAL

**(A)** HEARING

Whenever a complaint has been received under subsection (b)(6) or (k), the parents or the local educational agency involved in such complaint shall

have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency.

. . .

**(2)** **LIMITATIONS ON HEARING**

. . .

**(E) DECISION OF HEARING OFFICER**

**(i)** **IN GENERAL**
Subject to clause (ii), a decision made by a hearing officer shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education.

**(i)** **PROCEDURAL ISSUES**
In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies—

**(I)** impeded the child's right to a free appropriate public education;

**(II)** significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or

**(III)** caused a deprivation of educational benefits.

**(ii)** **RULE OF CONSTRUCTION**
Nothing in this subparagraph shall be construed to preclude a hearing officer from ordering a local educational agency to comply with procedural requirements under this section.

**(F) RULE OF CONSTRUCTION**
Nothing in this paragraph shall be construed to affect the right of a parent to file a complaint with the State educational agency.

**(g)** **APPEAL**

**(1) IN GENERAL**
If the hearing required by subsection (f) is conducted by a local educational agency, any party aggrieved by the findings and decision rendered in such a hearing may appeal such findings and decision to the State educational agency.

**(2)** I<span style="font-variant:small-caps">MPARTIAL REVIEW AND INDEPENDENT DECISION</span>
The State educational agency shall conduct an impartial review of the findings and decision appealed under paragraph (1). The officer conducting such review shall make an independent decision upon completion of such review.

. . .

**(i)** A<span style="font-variant:small-caps">DMINISTRATIVE PROCEDURES</span>

    **(1)**    I<span style="font-variant:small-caps">N GENERAL</span>

        **(A)**    D<span style="font-variant:small-caps">ECISION MADE IN HEARING</span>
A decision made in a hearing conducted pursuant to subsection (f) or (k) shall be final, except that any party involved in such hearing may appeal such decision under the provisions of subsection (g) and paragraph (2).

        **(B)**    D<span style="font-variant:small-caps">ECISION MADE AT APPEAL</span>
A decision made under subsection (g) shall be final, except that any party may bring an action under paragraph (2).

. . .

**(j)** M<span style="font-variant:small-caps">AINTENANCE OF CURRENT EDUCATIONAL PLACEMENT</span>
Except as provided in subsection (k)(4), during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

**(k)** P<span style="font-variant:small-caps">LACEMENT IN ALTERNATIVE EDUCATIONAL SETTING</span>

    **(1)**    A<span style="font-variant:small-caps">UTHORITY OF SCHOOL PERSONNEL</span>

        **(A)**    C<span style="font-variant:small-caps">ASE-BY-CASE DETERMINATION</span>
School personnel may consider any unique circumstances on a case-by-case basis when determining whether to order a change in placement for a child with a disability who violates a code of student conduct.

        **(B)**    A<span style="font-variant:small-caps">UTHORITY</span>
School personnel under this subsection may remove a child with a disability who violates a code of student conduct from their current placement to an appropriate interim alternative educational setting, another setting, or suspension, for not more than 10 school days (to the extent such alternatives are applied to children without disabilities).

**(C)**     ADDITIONAL AUTHORITY

If school personnel seek to order a change in placement that would exceed 10 school days and the behavior that gave rise to the violation of the school code is determined not to be a manifestation of the child's disability pursuant to subparagraph (E), the relevant disciplinary procedures applicable to children without disabilities may be applied to the child in the same manner and for the same duration in which the procedures would be applied to children without disabilities, except as provided in section 1412(a)(1) of this title although it may be provided in an interim alternative educational setting.

**(D)**     SERVICES

A child with a disability who is removed from the child's current placement under subparagraph (G) (irrespective of whether the behavior is determined to be a manifestation of the child's disability) or subparagraph (C) shall—

**(i)**     continue to receive educational services, as provided in section 1412(a)(1) of this title, so as to enable the child to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP; and

**(ii)**    receive, as appropriate, a functional behavioral assessment, behavioral intervention services and modifications, that are designed to address the behavior violation so that it does not recur.

**(E)**     MANIFESTATION DETERMINATION

**(i)**     IN GENERAL

Except as provided in subparagraph (B), within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct, the local educational agency, the parent, and relevant members of the IEP Team (as determined by the parent and the local educational agency) shall review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine—

**(I)**     if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or

**(II)**    if the conduct in question was the direct result of the local educational agency's failure to implement the IEP.

**(ii)** **MANIFESTATION**
If the local educational agency, the parent, and relevant members of the IEP Team determine that either subclause (I) or (II) of clause (i) is applicable for the child, the conduct shall be determined to be a manifestation of the child's disability.

**(F)** **DETERMINATION THAT BEHAVIOR WAS A MANIFESTATION**
If the local educational agency, the parent, and relevant members of the IEP Team make the determination that the conduct was a manifestation of the child's disability, the IEP Team shall—

**(i)** conduct a functional behavioral assessment, and implement a behavioral intervention plan for such child, provided that the local educational agency had not conducted such assessment prior to such determination before the behavior that resulted in a change in placement described in subparagraph (C) or (G);

**(ii)** in the situation where a behavioral intervention plan has been developed, review the behavioral intervention plan if the child already has such a behavioral intervention plan, and modify it, as necessary, to address the behavior; and

**(iii)** except as provided in subparagraph (G), return the child to the placement from which the child was removed, unless the parent and the local educational agency agree to a change of placement as part of the modification of the behavioral intervention plan.

**(G)** **SPECIAL CIRCUMSTANCES**
School personnel may remove a student to an interim alternative educational setting for not more than 45 school days without regard to whether the behavior is determined to be a manifestation of the child's disability, in cases where a child—

**(i)** carries or possesses a weapon to or at school, on school premises, or to or at a school function under the jurisdiction of a State or local educational agency;

**(ii)** knowingly possesses or uses illegal drugs, or sells or solicits the sale of a controlled substance, while at school, on school premises, or at a school function under the jurisdiction of a State or local educational agency; or

**(iii)** has inflicted serious bodily injury upon another person while at school, on school premises, or at a school function under the jurisdiction of a State or local educational agency.

**(H) NOTIFICATION**
Not later than the date on which the decision to take disciplinary action is made, the local educational agency shall notify the parents of that decision, and of all procedural safeguards accorded under this section.

**(2) DETERMINATION OF SETTING**
The interim alternative educational setting in subparagraphs (C) and (G) of paragraph (1) shall be determined by the IEP Team.

**(3) APPEAL**

**(A) IN GENERAL**
The parent of a child with a disability who disagrees with any decision regarding placement, or the manifestation determination under this subsection, or a local educational agency that believes that maintaining the current placement of the child is substantially likely to result in injury to the child or to others, may request a hearing.

**(B) Authority of hearing officer**

**(i) IN GENERAL**
A hearing officer shall hear, and make a determination regarding, an appeal requested under subparagraph (A).

**(ii) CHANGE OF PLACEMENT ORDER**
In making the determination under clause (i), the hearing officer may order a change in placement of a child with a disability. In such situations, the hearing officer may—

**(I)** return a child with a disability to the placement from which the child was removed; or

**(II)** order a change in placement of a child with a disability to an appropriate interim alternative educational setting for not more than 45 school days if the hearing officer determines that maintaining the current placement of such child is substantially likely to result in injury to the child or to others.

**(4) PLACEMENT DURING APPEALS**
When an appeal under paragraph (3) has been requested by either the parent or the local educational agency—

**(A)** the child shall remain in the interim alternative educational setting pending the decision of the hearing officer or until the expiration of the time period provided for in paragraph (1)(C), whichever occurs first, unless the parent and the State or local educational agency agree otherwise; and

**(B)**    the State or local educational agency shall arrange for an expedited hearing, which shall occur within 20 school days of the date the hearing is requested and shall result in a determination within 10 school days after the hearing.

. . .

**(7)**    **DEFINITIONS**
In this subsection:

. . .

**(D)**    **SERIOUS BODILY INJURY**
The term "serious bodily injury" has the meaning given the term "serious bodily injury" under paragraph (3) of subsection (h) of section 1365 of title 18.

**(l)    RULE OF CONSTRUCTION**
Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C. 12101 et seq.], title V of the Rehabilitation Act of 1973 [29 U.S.C. 790 et seq.], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

**18 U.S.C. § 1365**

**(h)** As used in this section—

. . .

**(3)**    the term "serious bodily injury" means bodily injury which involves—

**(A)**    the substantial risk of death;

**(B)**    extreme physical pain;

**(C)**    protracted and obvious disfigurement; or

**(D)**    protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

## APPENDIX B

### Chronology of AG's Two Long–Term Suspensions

**February 24, 2017 Suspension**

February 24, 2017 – AG's parents notified that AG engaged in "extremely violent and unsafe behavior" and would be removed to an Interim Alternative Educational Setting (IAES) for 45 school days. (Dkt. 7-4, at ECF 32–33; Compl., at ¶¶ 71–74, 79.)

March 1, 2017 – Success Academy tells Plaintiffs that AG will receive two hours per day of instruction during the IAES. (Dkt. 7-4, at ECF 37; Compl., at ¶ 88.)

March 2, 2017 – IAES instruction began. (Dkt. 18-1.)

March 7, 2017 – Plaintiffs request an IDEA hearing to contest the suspension. (Dkt. 7-4, at ECF 36.)

March 10, 2017 – MDR determines that AG's behavior was not a manifestation of his educational disability. (*Id.* at ECF 37.)

March 11, 2017 – Plaintiffs again request an IHO hearing "seeking immediate reinstatement of A.G. to his current placement at Success Academy and compensatory services, among other relief." (*Id.*)

March 24 and 28, 2017 – IHO hearing held. (*Id.* at 36–37.)

March 29, 2017 – IHO decision issued finding that: (1) Defendants had failed to provide Patrick with notice and an opportunity for a suspension hearing in "plain violation of due process," but the IHO "did not have jurisdiction to order a suspension hearing in the matter;" (2) the allegations made by Defendants "did not rise to the level of serious bodily injury" as defined by the IDEA; (3) AG should be immediately reinstated to Success Academy; and (4) the DOE must provide "compensatory education" and related services for the days AG was out of school. (Compl., at ¶¶ 82–84.)

March 31, 2017 – AG returns to Success Academy after serving 24 school days of his 45-day suspension. (*Id.* at ¶ 85.)

**September 12, 2017 Suspension**

September 12, 2017 – Success Academy calls AG's parents to inform them that AG "had engaged in dangerous behavior and that he had hit his para[-professional] and stabbed her in the eye with a pencil, and that the para[-professional] immediately left the school via EMS." (Compl., at ¶ 103.)

September 13, 2017 – Plaintiffs receive a letter from Success Academy notifying them that AG could not attend school, was suspended for the prior day's behavior, would be removed to an IAES for 20 school days, and would receive a suspension hearing on September 18, 2017. (*Id.* at ¶¶ 104–105.)

September 18, 2017 – Defendant de Jongh holds a suspension hearing at Success Academy. (*Id.* at ¶¶ 107–116.)

September 19, 2017 – Defendant de Jongh finds that a 20–day suspension is appropriate. (*Id.* at ¶ 117.)

September 20, 2017 – Plaintiffs are notified of Defendant de Jongh's decision. (*Id.*)

September 21, 2017 – Plaintiffs file an expedited hearing request under the IDEA. (*Id.* at ¶ 119.) Plaintiffs subsequently withdrew their request, without prejudice, because the hearing date was set for October 17, 2017, i.e., after AG's suspension would have been fully served. (*Id.*)

September 26, 2017 – MDR determines that AG's behavior was a manifestation of his disability and that AG should "be returned to school immediately." (*Id.* at ¶¶ 120–23.)

September 27, 2017 – Patrick tries to bring AG back to school, but was told that he was not allowed to attend school and was required to serve his suspension, regardless of the MDR finding, because he had inflicted serious bodily injury. (*Id.* at ¶ 124.)

September 29, 2017 – Plaintiffs filed an internal appeal with Defendant Cole. (*Id.* at ¶ 125.)

October 16, 2017 – AG returns to school after serving his entire suspension. (Dkt. 16, at ¶ 63.)

October 17, 2017 – Plaintiffs re-file their IDEA impartial hearing request. (Compl., at ¶ 127.)

November 6, 2017 – IHO hearing held. (*Id.* at ¶ 128.)

November 14, 2017 – IHO decision issued finding "the appropriateness of both the suspension hearing held by Defendants and the suspension to an IAES to be outside his jurisdiction, . . . [but also] found that based on the record, it was highly unlikely that the standard of serious bodily injury was met." (*Id.* at ¶¶ 125, 128.) Additionally, the IHO awarded Plaintiffs compensatory special education services for each day of school that AG was in an IAES placement. (*Id.* at ¶ 84.)

## APPENDIX C

1) *Harris ex rel. Harris v. Pontotoc Cty. Sch. Dist.*, 635 F.3d 685, 690 (5th Cir. 2011) ("A student's transfer to an alternative education program [for 45 school days] does not deny access to public education and therefore does not violate a Fourteenth Amendment interest.").

2) *Swindle v. Livingston Par. Sch. Bd.*, 655 F.3d 386, 394 (5th Cir. 2011) ("This court has consistently held that a student who is removed from her regular public school, but is given access to an alternative education program, has not been denied her entitlement to public education.") (collecting cases).

3) *Langley v. Monroe Cty. Sch. Dist.*, 264 F. App'x 366, 368 (5th Cir. 2008) ("However misguided the school district's actions may have been, [appellant's] appeal must fail. . . . [W]e have previously held that a student's transfer to an alternative school for disciplinary reasons implicates no constitutionally-protected property interest.").

4) *Wayne v. Shadowen,* 15 F. App'x 271, 290 (6th Cir. 2001) (finding no deprivation of property interest where the student was placed in a special correctional classroom because he "would have received all of the basic fundamentals of a proper and an adequate education while in the [alternative education] [p]rogram[,] with the added benefit of a monitored, disciplined environment which would have been more suitable than the traditional classroom to the individual instructional needs of this recalcitrant recidivist serious offender") (internal quotation marks omitted).

5) *Esparza v. Bd. of Trs.*, 182 F.3d 915, 915 (5th Cir. 1999) (finding plaintiffs given a one-week in-school suspension were "not being deprived of their access to public education, because they are not being excluded or suspended from attending classes[;] [r]ather, they are only being transferred from one school program to another program with stricter discipline") (citation and internal quotation marks omitted).

6) *Sanchez v. Friendswood Indep. Sch. Dist.*, 134 F.3d 367, 367 (5th Cir. 1997) (per curiam) ("The school district did not violate [the student's] substantive or procedural due process rights by transferring him to an alternative learning environment for disciplinary reasons.").

7) *Nevares v. San Marcos Consol. Independent School Dist.*, 111 F.3d 25, 26–27 (5th Cir. 1997) ("[Appellant] is not being denied access to public education, not even temporarily. . . . A transfer to a different school for disciplinary reasons has also been held not to support the court's jurisdiction on constitutional grounds. . . . And because the United States Constitution has not been offended in the present dispute, we retire from it.").

8) *DeCossas v. St. Tammany Par. Sch. Bd.*, No. 16–CV–3786 (NJB), 2017 WL 3971248, at \*12–13, 22 (E.D. La. Sept. 8, 2017) ("Movants have pointed to evidence that [plaintiff] was provided with an alternative school setting such that he was not at risk of being deprived of a public education. . . . Accordingly, under Fifth Circuit precedent, because the uncontroverted evidence in the record demonstrates that [plaintiff] was provided with an alternative school

setting and was therefore not denied access to public education, [p]laintiffs have not established that the expulsion of [plaintiffs] violated [p]laintiffs' . . . due process rights.").

9) *CLM ex rel. McNeil v. Sherwood Sch. Dist. 88J*, No. 3:15–CV–1098 (SB), 2016 WL 8944450, at *12 (D. Or. Dec. 30, 2016) (finding plaintiff was not deprived of a property interest, *inter alia*, where "alternate forms of education would be made available to [plaintiff]"), *report and recommendation adopted*, No. 3:15–CV–1098 (SB), 2017 WL 2129301 (D. Or. May 16, 2017).

10) *I.U. ex rel. Roy v. Pioneer Valley Chinese Immersion Charter Sch.*, No. 14–CV–12709 (MAP), 2016 WL 8679257, at *8 (D. Mass. June 10, 2016), (stating that "[n]umerous other federal courts also have declined to find a constitutionally protected property interest when a student is subjected to an in-school suspension that includes assigned school work") (collecting cases), *report and recommendation adopted sub nom. I.U. v. Pioneer Valley Chinese Immersion Charter Sch.*, No. 14–CV–12709 (MAP), 2016 WL 4792182 (D. Mass. Sept. 14, 2016).

11) *Lindsey v. Matayoshi*, 950 F. Supp. 2d 1159, 1169 (D. Haw. 2013) ("[A] student who is removed from her regular public school, but is given access to an alternative education program, has not been denied her entitlement to public education.") (quoting *Swindle*, 655 F.3d at 394) (collecting cases).

12) *Robinson v. St. Tammany Parish Public School System*, 983 F. Supp. 2d 835, 845 (E.D. La. 2013) (holding that because plaintiff "ultimately was only transferred to another school[,] . . . [p]laintiffs cannot establish that a deprivation of a property interest occurred here"), *aff'd*, 569 F. App'x 303 (5th Cir. 2014).

13) *J.J. ex rel. Vantress v. Oak Grove Sch. Dist.*, No. 08–CV–5376 (RMW), 2013 WL 3158069, at *9 (N.D. Cal. June 20, 2013) ("[F]orced transfer to another school . . . d[oes] not violate due process.").

14) *R.B. ex rel. D.L.B. v. Hinds Cty. Sch. Dist.*, No. 3:07–CV–329 (DP)(JJ), 2009 WL 4738181, at *4 (S.D. Miss. Dec. 4, 2009) ("Defendant argues that the transfer of a student to an alternative school does not implicate a constitutionally protected interest. This assertion is well-supported by case law.") (collecting cases).

15) *Salas v. United Indep. Sch. Dist.*, No. 08–CV–22(L) (GPK), 2009 WL 1035068, at *2 (S.D. Tex. Apr. 17, 2009) ("[P]lacement in an alternative education program does not deprive students of their [property] interest.").

16) *Foster v. Tupelo Pub. Sch. Dist.*, 569 F. Supp. 2d 667, 676 (N.D. Miss. 2008) ("The Fifth Circuit [has] determined that transfer to an alternative school program was not a denial of access to public education.") (citation omitted).

17) *Thorns v. Madison Dist. Pub. Sch.*, No. 06–CV–10674 (SFC), 2007 WL 1647889, at *3–4 (E.D. Mich. June 5, 2007) (finding plaintiffs cannot maintain a procedural due process action based on the suspension where they did not lose their right to education).

18) *DNK ex rel. Kassem v. Douglas Cty. Sch. Dist.*, No. 04–CV–2513 (MSK)(CBS), 2006 WL 2331086, at *9 (D. Colo. Aug. 10, 2006) ("A transfer to another school does not amount to suspension under Colorado law. . . . [Plaintiff's] property interest in his continued education did not equate to a property interest in being educated at [a specific school].").

19) *Flynn v. Terrebonne Par. Sch. Bd.*, No. 03–CV–2500(A) (SSV), 2004 WL 2009277, at *4 (E.D. La. Sept. 8, 2004) ("[T]he Fifth Circuit has held that a disciplinary transfer to another school . . . does not abridge a protected property interest, because the student continues to attend school and thus is not deprived of access to education, even temporarily.").

20) *Cain v. Tigard–Tualatin Sch. Dist. 23J*, 262 F. Supp. 2d 1120, 1135 (D. Or. 2003) (holding that where a student was forced to transfer to another school due to bullying, plaintiff was not deprived of a property interest because "it was undisputed that [he] continued to attend high school at all relevant times during the events in question").

21) *Hammock ex rel. Hammock v. Keys*, 93 F. Supp. 2d 1222, 1233 (S.D. Ala. 2000) ("[Plaintiff] was offered admission to the Alternative School numerous times throughout the expulsion process. While the Alternative School may not be her school of choice, there is no indication that 'the right to a public education encompasses a right to choose one's particular school.'") (quoting *Driscoll*, 82 F.3d at 389 n.5).

22) *Jarmon v. Batory*, No. 94-CV–284 (HJH), 1994 WL 313063, at *10 (E.D. Penn. June 29, 1994) ("A student's interest in obtaining an education is certainly weighty. However, any potential harm to the private interest at stake in the present case was mitigated by [the school] having provided [plaintiff] with alternative educational opportunities, in the form of homework assignments from her teachers, while she was excluded from school.") (citations omitted).

23) *Johnpoll v. Elias*, 513 F. Supp. 430, 431–32 (E.D.N.Y. 1980) (holding, with respect to school decision to transfer student, that plaintiff "not being permitted to attend the school of his choice is not tantamount to a denial of a right to an education").

24) *Fenton v. Stear*, 423 F. Supp. 767, 772 (W.D. Pa. 1976) ("But even if the school officials made a mistake in imposing disciplinary action in the circumstances, the punishment imposed is *de minimus*. Plaintiff was not deprived of any in-school education. He was ordered to report to a room which his lawyer calls a 'jail room,' supervised by a teacher and required to do his assigned school work. . . . [I]t seems apparent that he did not receive any material educational injury.").

# APPENDIX D

1) *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012) (finding no irreparable harm on a preliminary injunction motion where plaintiff attended an alternative school and "earned academic credit and stayed on track for graduation").

2) *Laney v. Farley*, 501 F.3d 577, 584 (6th Cir. 2007) (holding that an in-school suspension, even where students are provided with educational instruction, can violate due process when it "so isolates a student from educational opportunities that it infringes her property interest in an education").

3) *Zamora v. Pomeroy*, 639 F.2d 662, 670 (10th Cir. 1981) ("[Appellants'] allegations that the [alternative education] was so inferior to amount to an expulsion from the educational system are not borne out by the record, and in the absence of a clear showing that the [alternative education] assignment was substantially prejudicial, [appellants] lack the requisite standing to attack the appellees' actions on that ground.").

4) *McKinney ex rel. K.P. v. Huntsville Sch. Dist.*, No. 5:18–CV–5067 (TLB), 2018 WL 5078112, at *1 (W.D. Ark. Oct. 17, 2018) (stating that courts "routinely hold that a student suffers no irreparable harm [during a suspension] where the District provides an alternative educational option and where the student can stay on track to graduate") (collecting cases).

5) *Gentry v. Mountain Home Sch. Dist.,* No. 3:17–CV–3008 (TLB), 2018 WL 2145011, at *10 (W.D. Ark. May 9, 2018) ("The Court believes [plaintiff] has raised a genuine, material question of fact as to whether completing the last few months of his senior year at the [alternative educational setting] . . . would have been significantly different from or inferior to the education he would have received at Mountain Home High School. There is evidence in the record that the [alternative placement] did not offer many, if any, of the courses [plaintiff] was taking during his last semester at Mountain Home High School, and that it did not offer certain classes [plaintiff] needed to take, not simply to graduate, but to graduate and attend the colleges to which he had been provisionally accepted.").

6) *E.S. ex rel. D.K v. Brookings Sch. Dist.*, No. 4:16-CV-04154 (KES), 2018 WL 2338796, at *4–5 (D.S.D. May 23, 2018) (finding that the plaintiff was deprived of a property interest where "she was not assigned work in her regular classes and did not receive any instruction from a certified teacher").

7) *Doe v. Blake Sch.*, 310 F. Supp. 3d 969, 983 (D. Minn. 2018) (finding no irreparable harm where a student was able to complete his coursework remotely).

8) *Edwards v. MiraCosta Coll.*, No. 3:16–CV–1024 (BEN)(JMA), 2017 WL 2670845, at *5 (S.D. Cal. June 20, 2017) (finding plaintiff adequately pled a deprivation of a liberty interest where he "alleged that the suspension ha[d] negatively affected his grade point average, resulted in him being placed on academic probation, and caused him to be ineligible for academic scholarships").

9) *Conklin v. Jefferson Cty. Bd. of Educ.*, 205 F. Supp. 3d 797, 806 (N.D.W. Va. 2016) (finding no deprivation of plaintiffs' "entire educational interest" where plaintiff "was placed on home bound instruction" in a public library but still graduated timely, "an accomplishment that would not have been possible had the plaintiff been deprived of educational benefits") (citation omitted).

10) *Clodfelter v. Alexander Cty. Bd. of Educ.*, No. 5:16–CV–0021 (RLV)(DCK), 2016 WL 7365183, at *6 (W.D.N.C. Dec. 19, 2016) ("Courts addressing whether the due process requirements adopted by *Goss* apply within the context of challenges to disciplinary placements in alternative learning programs have resolved the question in the negative so long as the alternative learning program provides the disciplined student with a meaningful public education opportunity.") (collecting cases).

11) *Nixon v. Hardin Cty. Bd. of Educ.*, 988 F. Supp. 2d 826, 840 (W.D. Tenn. 2013) ("The Sixth Circuit . . . has suggested that assignment to an alternative school may not implicate the Due Process Clause at all, 'absent some showing that the education received at the alternative school is significantly different from or inferior to that received at [the student's] regular public school.'") (quoting *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1359 (6th Cir. 1996)).

12) *Jones v. Long Cty. Sch. Dist.*, No. 2:11–CV–005 (LGW), 2012 WL 3562300, at *5 (S.D. Ga. August 14, 2012) (finding plaintiff was "not totally deprived of his access to public education" where "the in-school suspension program allowed [him] to receive regular assignments and adequate instruction . . . at all times proctored by a duly qualified instructor") (citations and internal quotation marks omitted).

13) *S.B. ex rel. Brown v. Ballard Cty. Bd. of Educ.*, 780 F. Supp. 2d 560, 563–64 (W.D. Ky. 2011) (finding no deprivation because "the [c]ourt believes . . . that [p]laintiff is receiving a sufficiently equivalent education in the Alternative School").

14) *Rivera v. Jones*, No. 06–CV–19 (GPK), 2008 WL 4279628, at *2–3 (S.D. Tex. Sept. 11, 2008) (finding plaintiff did not allege a deprivation of a property interest where he "continued his freshman year at the [alternative placement], obtained all his credits for his freshman year, and performed adequately on his state assessment tests[,] . . . [and] [a]ccording to his mother, . . . even received an education superior to that offered by [his original school]") (citation and internal quotation marks omitted).

15) *Jacobs v. Clark Cty. Sch. Dist.*, 373 F. Supp. 2d 1162, 1183 (D. Nev. 2005) (finding defendants demonstrated plaintiff's "record in school ha[d] not suffered and that, in fact, she performed better" while suspended because she was allowed to complete her schoolwork from home), *aff'd*, 526 F.3d 419 (9th Cir. 2008).

16) *J.S. ex rel. Duck v. Isle of Wight Cty. Sch. Bd.*, 362 F. Supp. 2d 675, 685 (E.D. Va. 2005) (finding that plaintiff failed to make a "strong showing" in a motion for preliminary injunction that "the Alternative School [was] inferior" to his prior school).

17) *Marner ex rel. Marner v. Eufaula City Sch. Bd.*, 204 F. Supp. 2d 1318, 1324 (M.D. Ala. 2002) ("The evidence regarding the alternative school . . . demonstrates that although no classical classroom instruction occurred at the alternative school, [plaintiff] would have been allowed to do his regular school work and to be graded as if he were in the regular classroom. Assistance would have been provided had it been sought. Although the alternative school was in a separate location, the students assigned there [were] not in complete isolation, but [were] allowed one-on-one contact with certified teachers, and may receive assistance from their regular classroom teachers. There was no evidence presented that any student assigned to the alternative school suffered a detriment to his educational opportunities. In fact, the evidence was to the contrary, as specific examples were given of students who actually improved their grades while in the alternative school [for 45 school days].").

18) *Casey v. Newport Sch. Comm.*, 13 F. Supp. 2d 242, 246 (D.R.I. 1998) ("Here, [plaintiff] was not deprived of his right to a public education. He continued to attend all of his classes except science. Moreover, he continued to receive instruction in science from . . . a qualified science teacher. Finally, the transfer was effective only for the last five weeks of the school year. Thus, the alleged deprivation is a far cry from the 'total exclusion from the educational process for more than a trivial period' referred to in *Goss*.") (quoting *Goss*, 419 U.S. at 576).

19) *Alabama & Coushatta Tribes of Tex. v. Trs. of Big Sandy Indep. Sch. Dist.*, 817 F. Supp. 1319, 1324 (E.D. Tex. 1993) (finding students were deprived of a property interest where, *inter alia*, students were suspended for a month in-school, supervised by an unlicensed teacher, and "not given regular instruction by [a] teacher," which caused plaintiffs to "generally f[a]ll behind in their school work while they were suspended").

20) *Mrs. A.J. v. Special Sch. Dist. No. 1*, 478 F. Supp. 418, 430 (D. Minn. 1979) ("In light of the historical control extended to school officials in making instructional decisions, and the discretionary nature of the determination as to the adequacy of an alternative program for suspended students, the Court has concluded that such a determination can be deemed unlawful only if it is established that school authorities acted or failed to act with a manifest abuse of discretion.").